ARIZONA ET AL. *v.* SAN CARLOS APACHE TRIBE OF
ARIZONA ET AL.

No. 81–2147.   Argued March 23, 1983—Decided July 1, 1983*

---

*Together with *Arizona et al.* v. *Navajo Tribe of Indians et al.* (see this Court's Rule 19.4), and No. 81–2188, *Montana et al.* v. *Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation et al.*, also on certiorari to the same court.

546

*Jon L. Kyl* argued the cause for petitioners in No. 81–2147. With him on the briefs were *M. Byron Lewis, John B. Weldon, Jr., Alvin H. Shrago, Robert K. Corbin,* Attorney General of Arizona, *Russell A. Kolsrud,* Assistant Attorney General, and *Bill Stephens. Michael T. Greely,* Attorney General of Montana, argued the cause for petitioners in No. 81–2188. With him on the brief were *Helena S. Maclay* and *Deirdre Boggs,* Special Assistant Attorneys General, *Cale Crowley, Maurice R. Colberg, Jr., James E. Seykora, Bert W. Kronmiller,* and *Douglas Y. Freeman.*

*Deputy Solicitor General Claiborne* argued the cause for the United States in both cases. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Dinkins,* and *Thomas H. Pacheco.*

*Simon H. Rifkind* argued the cause for respondents in No. 81–2147. With him on the brief for respondent Navajo

Nation were *Mark H. Alcott, Peter Buscemi, George P. Vlassis,* and *Katherine Ott. Joe P. Sparks, E. Dennis Siler,* and *Kevin T. Tehan* filed a brief for respondents San Carlos Apache Indian Tribe et al. *Philip J. Shea* filed a brief for respondent Salt River Pima-Maricopa Indian Community. *Arlinda Locklear* and *Richard Dauphinais* filed a brief for respondent Ft. McDowell Mohave-Apache Indian Community. *Robert S. Pelcyger* argued the cause for respondents in No. 81–2188 and filed a brief for respondent Crow Tribe of Indians. *Reid Peyton Chambers, Loftus E. Becker, Jr., Jeanne S. Whiteing,* and *Richard Anthony Baenen* filed a brief for respondents Assiniboine and Sioux Tribes et al. *Steven L. Bunch* filed a brief for respondent Bowen.†

JUSTICE BRENNAN delivered the opinion of the Court.

These consolidated cases form a sequel to our decision in *Colorado River Water Conservation District* v. *United States,* 424 U. S. 800 (1976). That case held that (1) the McCarran Amendment, 66 Stat. 560, 43 U. S. C. § 666, which

---

†Briefs of *amici curiae* urging reversal in both cases were filed by *J. D. MacFarlane,* Attorney General, *Charles G. Howe,* Deputy Attorney General, *Joel W. Cantrick,* Solicitor General, and *David Ladd* and *William A. Paddock,* Assistant Attorneys General, for the State of Colorado; by *Jeff Bingaman,* Attorney General, and *Peter Thomas White,* Special Assistant Attorney General, for the State of New Mexico; by *Mark V. Meierhenry,* Attorney General, and *Harold H. Deering* and *John P. Guhin,* Assistant Attorneys General, for the State of South Dakota; by *Kenneth O. Eikenberry,* Attorney General of Washington, *Charles B. Roe, Jr.,* Senior Assistant Attorney General, *David H. Leroy,* Attorney General of Idaho, and *David L. Wilkinson,* Attorney General of Utah, for the State of Washington et al.; by *Steven F. Freudenthal,* Attorney General, *Lawrence J. Wolfe,* Assistant Attorney General, *Michael D. White,* and *James L. Merrill* for the State of Wyoming; and by *Kenneth Balcomb, Robert L. McCarty,* and *Donald H. Hamburg* for the Colorado River Water Conservation District et al.

*Lester K. Taylor* filed a brief for the Jicarilla Apache Tribe as *amicus curiae* urging affirmance in both cases. *Richard W. Hughes* filed a brief for the Chippewa-Cree Tribes of the Rocky Boys Reservation, Montana, as *amicus curiae* urging affirmance in No. 81–2188.

waived the sovereign immunity of the United States as to comprehensive state water rights adjudications,[1] provides state courts with jurisdiction to adjudicate Indian water rights held in trust by the United States, and (2), in light of the clear federal policies underlying the McCarran Amendment, a water rights suit brought by the United States in federal court was properly dismissed in favor of a concurrent comprehensive adjudication reaching the same issues in Colorado state court. The questions in these cases are parallel: (1) What is the effect of the McCarran Amendment in those States which, unlike Colorado, were admitted to the Union subject to federal legislation that reserved "absolute jurisdiction and control" over Indian lands in the Congress of the United States? (2) If the courts of such States do have jurisdiction to adjudicate Indian water rights, should concurrent federal suits brought by Indian tribes, rather than by the United States, and raising only Indian claims, also be subject to dismissal under the doctrine of *Colorado River?*

## I

*Colorado River* arose out of a suit brought by the Federal Government in the United States District Court for the District of Colorado seeking a declaration of its rights, and the rights of a number of Indian Tribes, to waters in certain riv-

---

[1] The McCarran Amendment provides in relevant part:

"(a) Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or is in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to such suit. The United States, when a party to any such suit, shall (1) be deemed to have waived any right to plead that the State laws are inapplicable or that the United States is not amenable thereto by reason of its sovereignty, and (2) shall be subject to the judgments, orders and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances . . . ."

ers and their tributaries located in one of the drainage basins of the State of Colorado. In the suit, the Government asserted reserved rights, governed by federal law,[2] as well as rights based on state law. Shortly after the federal suit was commenced, the United States was joined, pursuant to the McCarran Amendment, as a party in the ongoing state-court comprehensive water adjudication being conducted for the same drainage basin. The Federal District Court, on motion of certain of the defendants and intervenors, dismissed the federal suit, stating that the doctrine of abstention required deference to the state proceedings. The Court of Appeals reversed the District Court, and we in turn reversed the Court of Appeals.

We began our analysis in *Colorado River* by conceding that the District Court had jurisdiction over the federal suit under 28 U. S. C. § 1345, the general provision conferring district court jurisdiction over most civil actions brought by the Federal Government. We then examined whether the federal suit was nevertheless properly dismissed in view of the concurrent state-court proceedings. This part of the analysis began by considering "whether the McCarran Amendment provided consent to determine federal reserved rights held on behalf of Indians in state court," 424 U. S., at 809, since "given the claims for Indian water rights in [the federal suit], dismissal clearly would have been inappropriate if the state court had no jurisdiction to decide those claims." *Ibid.* We concluded:

> "Not only the Amendment's language, but also its underlying policy, dictates a construction including Indian rights in its provisions. [*United States* v. *District Court for Eagle County*, 401 U. S. 520 (1971),] rejected the conclusion that federal reserved rights in general were not reached by the Amendment for the reason that the

---

[2] See generally *Arizona* v. *California*, 373 U. S. 546 (1963); *Winters* v. *United States*, 207 U. S. 564 (1908).

Amendment '[deals] with an all-inclusive statute concerning "the adjudication of rights to the use of water of a river system."' *Id.*, at 524. This consideration applies as well to federal water rights reserved for Indian reservations." *Id.*, at 810.

In sum, considering the important federal interest in allowing all water rights on a river system to be adjudicated in a single comprehensive state proceeding, and "bearing in mind the ubiquitous nature of Indian water rights in the Southwest," it was clear to us "that a construction of the Amendment excluding those rights from its coverage would enervate the Amendment's objective." *Id.*, at 811.

We buttressed this conclusion with an examination of the legislative history of the McCarran Amendment. We also noted:

"Mere subjection of Indian rights to legal challenge in state court . . . would no more imperil those rights than would a suit brought by the Government in district court for their declaration . . . . The Government has not abdicated any responsibility fully to defend Indian rights in state court, and Indian interests may be satisfactorily protected under regimes of state law. The Amendment in no way abridges any substantive claim on behalf of Indians under the doctrine of reserved rights. Moreover, as *Eagle County* said, 'questions [arising from the collision of private rights and reserved rights of the United States], including the volume and scope of particular reserved rights, are federal questions which, if preserved, can be reviewed [by the Supreme Court] after final judgment by the Colorado court.' 401 U. S., at 526." *Id.*, at 812–813 (citations omitted).

We then considered the dismissal itself. We found that the dismissal could not be supported under the doctrine of abstention in any of its forms, but that it was justified as an application of traditional principles of "'[w]ise judicial admin-

istration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *Id.*, at 817, quoting *Kerotest Mfg. Co.* v. *C–O–Two Fire Equipment Co.*, 342 U. S. 180, 183 (1952). We stated that, although the federal courts had a "virtually unflagging obligation . . . to exercise the jurisdiction given them," 424 U. S., at 817, there were certain very limited circumstances outside the abstention context in which dismissal was warranted in deference to a concurrent state-court suit. See generally *id.*, at 817–819; *Moses H. Cone Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 13–19 (1983). In the case at hand, we noted the comprehensive nature of the state proceedings and the considerable expertise and technical resources available in those proceedings, 424 U. S., at 819–820. We concluded:

> "[A] number of factors clearly counsel against concurrent federal proceedings. The most important of these is the McCarran Amendment itself. The clear federal policy evinced by that legislation is the avoidance of piecemeal adjudication of water rights in a river system. This policy is akin to that underlying the rule requiring that jurisdiction be yielded to the court first acquiring control of property, for the concern in such instances is with avoiding the generation of additional litigation through permitting inconsistent dispositions of property. This concern is heightened with respect to water rights, the relationships among which are highly interdependent. Indeed, we have recognized that actions seeking the allocation of water essentially involve the disposition of property and are best conducted in unified proceedings. The consent to jurisdiction given by the McCarran Amendment bespeaks a policy that recognizes the availability of comprehensive state systems for adjudication of water rights as the means for achieving these goals." *Id.*, at 819 (citations omitted).

For these reasons, and others,[3] we affirmed the judgment of the District Court dismissing the federal complaint.

## II

The two petitions considered here arise out of three separate consolidated appeals that were decided within three days of each other by the same panel of the Court of Appeals for the Ninth Circuit. In each of the underlying cases, either the United States as trustee or certain Indian Tribes on their own behalf, or both, asserted the right to have certain Indian water rights in Arizona or Montana adjudicated in federal court.

### The Montana Cases (No. 81–2188)

In January 1975, the Northern Cheyenne Tribe brought an action in the United States District Court for the District of Montana seeking an adjudication of its rights in certain streams in that State. Shortly thereafter, the United States brought two suits in the same court, seeking a determination of water rights both on its own behalf and on behalf of a number of Indian Tribes, including the Northern Cheyenne, in the same streams. Each of the federal actions was a general adjudication which sought to determine the rights *inter sese* of *all* users of the stream, and not merely the rights of the plaintiffs. On motion of the Northern Cheyenne, its action was consolidated with one of the Government actions. The other concerned Tribes intervened as appropriate.

At about the time that all this activity was taking place in federal court, the State of Montana was preparing to begin a

---

[3] The other factors were the apparent absence at the time of dismissal of any proceedings in the District Court other than the filing of the complaint, the extensive involvement of state water rights in the suit, the 300-mile distance between the Federal District Court in Denver and the state tribunal, and the Government's apparent willingness to participate in other comprehensive water proceedings in the state courts.

process of comprehensive water adjudication under a recently passed state statute. In July 1975, the Montana Department of Natural Resources and Conservation filed petitions in state court commencing comprehensive proceedings to adjudicate water rights in the same streams at issue in the federal cases.

Both sets of contestants having positioned themselves, nothing much happened for a number of years. The federal proceedings were stayed for a time pending our decision in *Colorado River*. When that decision came down, the State of Montana, one of the defendants in the federal suits, brought a motion to dismiss, which was argued in 1976, but not decided until 1979. Meanwhile, process was completed in the various suits, answers were submitted, and discovery commenced. Over in the state courts, events moved even more slowly, and no appreciable progress seems to have been made by 1979.

In April 1979, the United States brought four more suits in federal court, seeking to adjudicate its rights and the rights of various Indian Tribes in other Montana streams. One month later, the Montana Legislature amended its water adjudication procedures "to expedite and facilitate the adjudication of existing water rights." Act to Adjudicate Claims of Existing Water Rights in Montana, Ch. 697, § 1(1), 1979 Mont. Laws 1901. The legislation provided for the initiation of comprehensive proceedings by order of the Montana Supreme Court, the appointment of water judges throughout the State, and the consolidation of all existing actions within each water division. It also provided, among other things, that the Montana Supreme Court should issue an order requiring all claimants not already involved in the state proceedings, including the United States on its own behalf or as trustee for the Indians, to file a statement of claim with the Department of Natural Resources and Conservation by a date set by the court or be deemed to have abandoned any water rights claim. § 16, 1979 Mont. Laws 1906–1907, codi-

fied at Mont. Code Ann. § 85–2–212 (1981).[4]   The Montana court issued the required order, and the United States was served with formal notice thereof.[5]

In November 1979, the two judges for the District of Montana jointly considered the motions to dismiss in each of the federal actions,[6] and granted each of them.   *Northern Cheyenne Tribe of Northern Cheyenne Indian Reservation* v. *Tongue River Water Users Assn.*, 484 F. Supp. 31.   The court relied strongly on the new Montana legislation, stating:

> "The above-cited sections reflect both the policy and the essential mechanism for adjudication of state water rights.   Adjudication by adversary proceeding initiated by one claimant against all others in his drainage has been forsaken in favor of blanket adjudication of *all* claims, including federal and federal trust claims . . . .   It is clear that the adjudication contemplated by the [1979 legislation] is both comprehensive and efficient.   As the general adjudication has been initiated by recent order of the Montana Supreme Court, it would seem that the greater wisdom lies in following *Colorado River*, and, on the basis of wise judicial administration, deferring to the comprehensive state proceedings."   *Id.*, at 35–36.

---

[4] The statute required that the filing period established by the Montana Supreme Court be no less than one year, and that it be subject to extension, but not beyond June 30, 1983.   Mont. Code Ann. § 85–2–212(2) (1981).   In 1981, the statute was amended to exempt from the filing deadline Indian claims being negotiated with the Montana Reserved Water Rights Compact Commission.   Ch. 268, § 4, 1981 Mont. Laws 393, codified at Mont. Code Ann. § 85–2–217 (1981).

[5] The Montana Supreme Court set an original filing deadline of January 1, 1982, App. to Pet. for Cert. in No. 81–2188, pp. 138–139, and then extended the deadline to April 30, 1982, *id.*, at 140–141.   The United States apparently made protective filings by the deadline on behalf of all the Montana Tribes.   Brief for Petitioners in No. 81–2188, p. 32.   Two of the Indian Tribes apparently filed statements of claim of their own, and five apparently are negotiating with the Montana Reserved Water Rights Compact Commission, see n. 4, *supra.*

[6] See generally C. Wright, Law of Federal Courts 9 (4th ed. 1983).

The District Court also noted, among other things, that the federal proceedings "are all in their infancy; service of process has been but recently completed," *id.*, at 36, that the state forums were geographically more convenient to the parties, that "[t]he amount of time contemplated for completion of the state adjudication is significantly less than would be necessary for federal adjudication, insofar as the state has provided a special court system solely devoted to water rights adjudication," *ibid.*, and that "[t]he possibility of conflicting adjudications by the concurrent forums . . . looms large and could be partially avoided only by staying the pending state adjudication, an action *Colorado River* has intimated is distinctly repugnant to a clear state policy and purpose." *Ibid.*

On appeal, a divided Court of Appeals reversed. *Northern Cheyenne Tribe of Northern Cheyenne Indian Reservation* v. *Adsit*, 668 F. 2d 1080 (CA9 1982). First, it held that Montana, unlike Colorado, might well lack jurisdiction to adjudicate Indian claims in state court. The court reached this conclusion on the basis of two closely linked documents: the Enabling Act under which Montana was admitted to statehood, and the Montana Constitution promulgated in response to that Enabling Act, both of which provide, in identical terms, that the people inhabiting Montana

> "agree and declare that they forever disclaim all right and title to . . . all lands . . . owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States . . . ." Enabling Act of Feb. 22, 1889, § 4, 25 Stat. 677 (North Dakota, South Dakota, Montana, and Washington); Mont. Const., Ordinance No. I (1895).

The Court of Appeals concluded that, by their terms, the Enabling Act and constitutional disclaimer prohibit Montana

from exercising even adjudicatory jurisdiction over Indian water rights, and that the McCarran Amendment effected no change in that disability. It also held, however, that the State might have acquired such jurisdiction under Pub. L. 280, 67 Stat. 588, which, from 1953 until its amendment in 1968, allowed any State that wished to do so to acquire certain aspects of civil and criminal jurisdiction over Indian affairs, and authorized States with constitutional or statutory disclaimers to "amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment" to the assumption of such jurisdiction. § 6, 67 Stat. 590. See generally *Washington* v. *Yakima Indian Nation,* 439 U. S. 463 (1979). The court did not decide whether Montana had amended its Constitution in accordance with the requirements of Pub. L. 280, cf. *Yakima Indian Nation, supra,* at 478–493, but it criticized the District Court for not undertaking such an analysis.

The second, and dispositive, ground of decision in the Court of Appeals, however, was its conclusion that "[e]ven if we were to find that Montana had validly repealed the disclaimer language in its constitution, . . . [t]he limited factual circumstances of *[Colorado River]* prevent its application to the Montana litigation." 668 F. 2d, at 1087. In reaching this conclusion, the court relied in part on the infancy of both the federal and state proceedings in the Montana litigation, the possible inadequacy of the state proceedings (which it did not discuss in great detail), and the fact that the Indians (who could not be joined involuntarily in the state proceedings) might not be adequately represented by the United States in state court in light of conflicts of interest between the Federal Government's responsibilities as trustee and its own claims to water.

### *The Arizona Cases* (No. 81–2147)

In the mid-1970's, various water rights claimants in Arizona filed petitions in state court to initiate general adjudica-

tions to determine conflicting rights in a number of river systems. In early 1979, process was served in one of the proceedings on approximately 12,000 known potential water claimants, including the United States. In July 1981, process was served in another proceeding on approximately 58,000 known water claimants, again including the United States. In each case, the United States was joined both in its independent capacity and as trustee for various Indian Tribes.

In March and April 1979, a number of Indian Tribes whose rights were implicated by the state water proceedings filed a series of suits in the United States District Court for the District of Arizona, asking variously for removal of the state adjudications to federal court, declaratory and injunctive relief preventing any further adjudication of their rights in state court, and independent federal determinations of their water rights. A number of defendants in the federal proceedings filed motions seeking remand or dismissal. The District Court, relying on *Colorado River*, remanded the removed actions, and dismissed most of the independent federal actions without prejudice. *In re Determination of Conflicting Rights to Use of Water from Salt River Above Granite Reef Dam*, 484 F. Supp. 778 (1980).[7] It stayed one of the remaining actions pending the completion of state proceedings. App. to Pet. for Cert. in No. 81–2147, p. D–1.

The Tribes appealed from these decisions, with the exception of the remand orders.[8] The Court of Appeals reversed, holding that the Enabling Act under which Arizona was admitted to statehood, 36 Stat. 557, and the Arizona Constitu-

---

[7] Two of the actions are in abeyance, apparently pending completion of service of process.

[8] The stay order was certified for interlocutory appeal under 28 U. S. C. § 1292(b). See also *Moses H. Cone Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 8–13 (1983) (upholding appealability of similar stay order under 28 U. S. C. § 1291).

tion, Art. 20, ¶4, both of which contain wording substantially identical to the Montana Enabling Act and Constitution, disabled Arizona from adjudicating Indian water claims. *San Carlos Apache Tribe* v. *Arizona*, 668 F. 2d 1093 (CA9 1982); *Navajo Nation* v. *United States*, 668 F. 2d 1100 (CA9 1982). The court remanded to the District Court to determine whether Arizona nevertheless "properly asserted jurisdiction pursuant to Public Law 280." 668 F. 2d, at 1098; see 668 F. 2d, at 1102. The court did not decide whether, if the State had properly asserted jurisdiction, dismissal would have been proper under *Colorado River*, except to note that "the district judge did not make findings on this issue and the record indicates significant differences between these cases and *[Colorado River]*." 668 F. 2d, at 1098; see 668 F. 2d, at 1102.

We granted certiorari, 459 U. S. 821 (1982), in order to resolve a conflict among the Circuits regarding the role of federal and state courts in adjudicating Indian water rights.[9] We now reverse.

### III

### A

At the outset of our analysis, a number of propositions are clear. First, the federal courts had jurisdiction here to hear the suits brought both by the United States and the Indian Tribes.[10] Second, it is also clear in these cases, as it was in

---

[9] In *Jicarilla Apache Tribe* v. *United States*, 601 F. 2d 1116 (1979), the Court of Appeals for the Tenth Circuit held that the Enabling Act under which New Mexico was admitted to the Union (whose language is essentially the same as the Enabling Acts at issue in these cases) did not bar state jurisdiction over Indian water rights, and upheld the District Court's dismissal of a general water adjudication suit brought in federal court by the Jicarilla Apache Tribe.

[10] The primary ground of jurisdiction for the suits brought by the United States is 28 U. S. C. § 1345. The primary ground of jurisdiction for the suits brought by the Indians is 28 U. S. C. § 1362, which provides in rele-

*Colorado River,* that a dismissal or stay of the federal suits would have been improper if there was no jurisdiction in the concurrent state actions to adjudicate the claims at issue in the federal suits. 424 U. S., at 800. Third, the parties here agree that the Court of Appeals erred in believing that, in the absence of state jurisdiction otherwise, Pub. L. 280 would have authorized the States to assume jurisdiction over the adjudication of Indian water rights. To the contrary, Pub. L. 280 specifically withheld from state courts jurisdiction to adjudicate ownership or right to possession "of any real or personal property, *including water rights,* belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States." 28 U. S. C. § 1360(b) (emphasis added).[11] Thus, the presence or

_____

vant part: "The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe . . . wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." Section 1362 was passed in 1966 in order to give Indian tribes access to federal court on federal issues without regard to the $10,000 amount-in-controversy requirement then included in 28 U. S. C. § 1331, the general federal-question jurisdictional statute. Congress contemplated that § 1362 would be used particularly in situations in which the United States suffered from a conflict of interest or was otherwise unable or unwilling to bring suit as trustee for the Indians, and its passage reflected a congressional policy against relegating Indians to state court when an identical suit brought on their behalf by the United States could have been heard in federal court. See S. Rep. No. 1507, 89th Cong., 2d Sess., 2–3 (1966); H. R. Rep. No. 2040, 89th Cong., 2d Sess., 2, 4 (1966). Just as the McCarran Amendment did not do away with federal jurisdiction over water rights claims brought under § 1345, *Colorado River Water Conservation District* v. *United States,* 424 U. S. 800, 806–809 (1976), there is no reason to think that it limits the jurisdictional reach of § 1362.

[11] As we explained in *Colorado River,* however, these provisions "only qualif[y] the import of the general consent to state jurisdiction given by [Pub. L. 280, and] . . . [do] not purport to limit the special consent to jurisdiction given by the McCarran Amendment." 424 U. S., at 812–813, n. 20.

absence of jurisdiction must rise or fall without reference to whether the States have assumed jurisdiction under Pub. L. 280.

Finally, it should be obvious that, to the extent that a claimed bar to state jurisdiction in these cases is premised on the respective State Constitutions, that is a question of state law over which the state courts have binding authority. Because, in each of these cases, the state courts have taken jurisdiction over the Indian water rights at issue here, we must assume, until informed otherwise, that—at least insofar as state law is concerned—such jurisdiction exists. We must therefore look, for our purposes, to the federal Enabling Acts and other federal legislation, in order to determine whether there is a federal bar to the assertion of state jurisdiction in these cases.

B

That we were not required in *Colorado River* to interpret the McCarran Amendment in light of any statehood Enabling Act was largely a matter of fortuity, for Colorado is one of the few Western States that were not admitted to the Union pursuant to an Enabling Act containing substantially the same language as is found in the Arizona and Montana Enabling Acts.[12] Indeed, a substantial majority of Indian land—including most of the largest Indian reservations—lies in States subject to such Enabling Acts.[13] Moreover, the reason that Colorado was not subject to such an Enabling

---

[12] See Enabling Act of Feb. 22, 1889, §4, 25 Stat. 676–677 (North Dakota, South Dakota, Montana, and Washington); Enabling Act of July 16, 1894, §3, 28 Stat. 108 (Utah); Enabling Act of June 16, 1906, §3, 34 Stat. 270 (Oklahoma); Enabling Act of June 20, 1910, §§2, 20, 36 Stat. 558–559, 569 (New Mexico and Arizona); Enabling Act of July 7, 1958, §4, 72 Stat. 339, as amended by Pub. L. 86–70, §2(a), 73 Stat. 141 (Alaska). Idaho and Wyoming, which were both admitted to statehood in 1890 without prior Enabling Acts, nevertheless inserted disclaimers in their State Constitutions. See Idaho Const., Art. 21, §19; Wyo. Const., Art. 21, §26.

[13] See Brief for United States 12, and sources cited.

Act, and Arizona and Montana were, has more to do with historical timing than with deliberate congressional selection. Colorado was admitted to the Union in 1876. In 1882, this Court held in *United States* v. *McBratney*, 104 U. S. 621, that the federal courts in Colorado had no criminal jurisdiction in a murder committed by one non-Indian against another on an Indian reservation, pointing out that the case did not concern "the punishment of crimes committed by or against Indians, the protection of the Indians in their improvements, or the regulation by Congress of the alienation and descent of property and the government and internal police of the Indians." *Id.*, at 624. We also suggested, however, that the result might have been different if Congress had expressly reserved all criminal jurisdiction on Indian reservations when Colorado was admitted to the Union, pointing to a similar disclaimer contained in the legislation by which Kansas was admitted to statehood in 1861. *Id.*, at 623–624; see *The Kansas Indians*, 5 Wall. 737 (1867). Probably in response to the *McBratney* decision, Congress resumed the practice of including reservations in Enabling Acts, and did so in the case of virtually every State admitted after 1882. See n. 12, *supra*.

Despite *McBratney* and *The Kansas Indians*, the presence or absence of specific jurisdictional disclaimers has rarely been dispositive in our consideration of state jurisdiction over Indian affairs or activities on Indian lands. In *Draper* v. *United States*, 164 U. S. 240 (1896), for example, this Court held that, despite the jurisdictional reservation in the Montana Enabling Act, a federal court still did not have jurisdiction over a crime committed on an Indian reservation by one non-Indian against another. We stated:

> "As equality of statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated. The mere reservation of jurisdiction and control by the United States of 'Indian lands' does not of

necessity signify a retention of jurisdiction in the United States to punish all offences committed on such lands by others than Indians or against Indians." *Id.*, at 244–245.

Similarly, in *Organized Village of Kake* v. *Egan*, 369 U. S. 60 (1962), we held that a reservation in the Alaska Enabling Act did not deprive the State of the right to regulate Indian fishing licensed by the Department of the Interior, finding that the state regulation neither interfered with Indian self-government nor impaired any right granted or reserved by federal law. Conversely, *Worcester* v. *Georgia*, 6 Pet. 515 (1832), perhaps the most expansive declaration of Indian independence from state regulation ever uttered by this Court, pertained to one of the original 13 States, unbound by any Enabling Act whatsoever. See also, *e. g., The New York Indians*, 5 Wall. 761, 769–770 (1867) (reaching same conclusion as *The Kansas Indians*, *supra*, but without benefit of disclaimer). And our many recent decisions recognizing crucial limits on the power of the States to regulate Indian affairs have rarely either invoked reservations of jurisdiction contained in statehood Enabling Acts by anything more than a passing mention or distinguished between disclaimer States and nondisclaimer States. See, *e. g., New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324 (1983); *Ramah Navajo School Board* v. *Bureau of Revenue*, 458 U. S. 832 (1982); *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980); *Bryan* v. *Itasca County*, 426 U. S. 373 (1976); *Williams* v. *Lee*, 358 U. S. 217 (1959).

In light of this history, the parties in these cases have engaged in a vigorous debate as to the exact meaning and significance of the Arizona and Montana Enabling Acts.[14] We

---

[14] The United States, alone among the respondents, agrees that, in light of the McCarran Amendment, the Enabling Acts at issue here do not pose an obstacle to state jurisdiction to adjudicate Indian water rights. Brief for United States 11–15.

need not resolve that debate, however, nor need we resort to the more general doctrines that have developed to chart the limits of state authority over Indians, because we are convinced that, whatever limitation the Enabling Acts or federal policy may have originally placed on state-court jurisdiction over Indian water rights, those limitations were removed by the McCarran Amendment.[15]  Cf. *Washington* v. *Yakima Indian Nation*, 439 U. S., at 484–493.  Congress clearly would have had the right to distinguish between disclaimer and nondisclaimer States in passing the McCarran Amendment.  But the Amendment was designed to deal with a general problem arising out of the limitations that federal sovereign immunity placed on the ability of the States to adjudicate water rights, and nowhere in its text or legislative history do we find any indication that Congress intended the efficacy of the remedy to differ from one State to another. Moreover, we stated in *Colorado River* that "bearing in mind the ubiquitous nature of Indian water rights in the Southwest, it is clear that a construction of the Amendment excluding those rights from its coverage would enervate the Amendment's objective."  424 U. S., at 811.  The "ubiquitous nature of Indian water rights" is most apparent in the very States to which Congress attached jurisdictional reservations.  See *supra*, at 561.  To declare now that our holding in *Colorado River* applies only to that minority of Indian water claims located in States without jurisdictional reservations would constitute a curious and unwarranted retreat from the rationale behind our previous holding, and would work the very mischief that our decision in *Colorado River* sought to avoid. We need not rely on the possibly overbroad statement in

---

[15] Because we do not construe the original meaning of the Enabling Acts, we also have no occasion to decide (assuming the relevance of the Acts in the first place) whether the McCarran Amendment's grant of permission to the States to adjudicate Indian water rights was effected by a partial repeal of the Enabling Acts, or by an exercise of the very power reserved to Congress under those Acts.

*Draper* v. *United States* that "equality of statehood is the rule," 164 U. S., at 244, in order to conclude that, in this context at least, "equality of statehood" is sensible, necessary, and, most important, consistent with the will of Congress.

## IV

The second crucial issue in these cases is whether our analysis in *Colorado River* applies with full force to federal suits brought by Indian tribes, rather than by the United States, and seeking adjudication only of Indian water rights.[16] This question is not directly answered by *Colorado River*, because we specifically reserved in that case "[w]hether similar considerations would permit dismissal of a water suit brought by a private party in federal district court." 424 U. S., at 820,

---

[16] As is apparent from our discussion of the facts, *supra*, at 553–558, some of the cases now before us are suits brought by the United States. In light of our express holding in *Colorado River*, what we say here with regard to the suits brought by the Indians must apply *a fortiori* to the suits brought by the United States. In addition, some of the cases before us sought adjudication of *all* the rights to a particular water system, rather than merely Indian or other federal water rights, and it is argued that these suits avoid the "piecemeal adjudication of water rights" which we found in *Colorado River* to be inconsistent with federal policy. 424 U. S., at 819. See, *e. g.*, Brief for Respondents Assiniboine and Sioux Tribes et al. 25–29. Given, however, that one of the best arguments in favor of retaining federal jurisdiction in Indian water cases is that Indian water rights can be adjudicated separately and then incorporated into the results of the comprehensive state proceedings, see *infra*, at 567, the proper analysis of the more ambitious federal suits at issue here must also follow *a fortiori* from our discussion in text. A comprehensive federal adjudication going on at the same time as a comprehensive state adjudication might not literally be "piecemeal." It is, however, duplicative, wasteful, inconsistent with the McCarran Amendment's policy of "recogniz[ing] the availability of comprehensive state systems for adjudication of water rights as the means for [conducting unified water rights proceedings]," 424 U. S., at 819, likely to "generat[e] . . . additional litigation" as a result of "inconsistent dispositions of property," *ibid.*, and permeated with state-law issues entirely tangential to any conceivable federal interest, see *id.*, at 820; cf. *Moses H. Cone Hospital*, 460 U. S., at 19–26.

n. 26.   On reflection, however, we must agree with JUSTICE
STEVENS, who, in dissenting from our decision, wrote: "[T]he
Federal Government surely has no lesser right of access to
the federal forum than does a private [party], such as an In-
dian asserting his own claim.   If this be so, today's holding
will necessarily restrict the access to federal court of private
plaintiffs asserting water rights claims in Colorado." *Id.*,
at 827.

The United States and the various Indian respondents
raise a series of arguments why dismissal or stay of the fed-
eral suit is not appropriate when it is brought by an Indian
tribe and only seeks to adjudicate Indian rights.   (1) Indian
rights have traditionally been left free of interference from
the States.   (2) State courts may be inhospitable to Indian
rights.   (3) The McCarran Amendment, although it waived
United States sovereign immunity in state comprehensive
water adjudications, did not waive *Indian* sovereign immu-
nity.   It is therefore unfair to force Indian claimants to
choose between waiving their sovereign immunity by inter-
vening in the state proceedings and relying on the United
States to represent their interests in state court, particularly
in light of the frequent conflict of interest between Indian
claims and other federal interests and the right of the Indians
under 28 U. S. C. § 1362 to bring suit on their own behalf in
federal court.[17]   (4) Indian water rights claims are generally

---

[17] This argument, of course, suffers from the flaw that, although the
McCarran Amendment did not waive the sovereign immunity of Indians as
*parties* to state comprehensive water adjudications, it did (as we made
quite clear in *Colorado River*) waive sovereign immunity with regard to
the Indian *rights* at issue in those proceedings.   Moreover, contrary to the
submissions by certain of the parties, any judgment against the United
States, as trustee for the Indians, would ordinarily be binding on the Indi-
ans.   In addition, there is no indication in these cases that the state courts
would deny the Indian parties leave to intervene to protect their interests.
Thus, although the Indians have the right to refuse to intervene even if
they believe that the United States is not adequately representing their
interests, the practical value of that right in this context is dubious at best.

based on federal rather than state law. (5) Because Indian water claims are based on the doctrine of "reserved rights," and take priority over most water rights created by state law, they need not as a practical matter be adjudicated *inter sese* with other water rights, and could simply be incorporated into the comprehensive state decree at the conclusion of the state proceedings.

Each of these arguments has a good deal of force. We note, though, that very similar arguments were raised and rejected in *United States* v. *District Court for Eagle County*, 401 U. S. 520 (1971), and *Colorado River*.[18] More important, all of these arguments founder on one crucial fact: If the state proceedings have jurisdiction over the Indian water rights at issue here, as appears to be the case,[19] then concurrent federal proceedings are likely to be duplicative and wasteful, generating "additional litigation through permitting inconsistent dispositions of property." *Colorado River*, 424 U. S., at 819. Moreover, since a judgment by either court would ordinarily be res judicata in the other, the existence of such concurrent proceedings creates the serious potential for spawning an unseemly and destructive race to see which forum can resolve the same issues first—a race contrary to the entire spirit of the McCarran Amendment and prejudi-

---

[18] See, *e. g.*, Brief for United States in *United States* v. *District Court for Eagle County*, O. T. 1970, No. 87, p. 19 ("excluding reserved water rights of the United States from State adjudication proceedings would not produce the 'undesirable, impractical and chaotic situation' that the Colorado Supreme Court envisioned); Brief for United States in *Colorado River Conservation District* v. *United States*, O. T. 1975, No. 74–940, p. 33 (federal suit brought by United States involves only questions of federal law); pp. 35–36 (federal forum necessary to avoid "local prejudice"); pp. 43–44 (federal adjudication of Indian water rights can be incorporated into comprehensive state proceedings); p. 50 (separate proceedings practical, as long as all determinations are ultimately integrated); pp. 53–54 (construing McCarran Amendment to grant States jurisdiction to adjudicate Indian water rights would ignore "unique legal status of Indian property").

[19] But cf. n. 20, *infra*.

cial, to say the least, to the possibility of reasoned decision-making by either forum. The United States and many of the Indian Tribes recognize these concerns, but in responding to them they cast aside the sort of sound argument generally apparent in the rest of their submissions and rely instead on vague statements of faith and hope. The United States, for example, states that adjudicating Indian water rights in federal court, despite the existence of a comprehensive state proceeding, would not

"entail any duplication or potential for inconsistent judgments. The federal court will quantify the Indian rights only if it is asked to do so before the State court has embarked on the task. And, of course, once the United States district court has indicated its determination to perform that limited role, *we assume* the State tribunal will turn its attention to the typically more complex business of adjudicating all other claims on the stream. *In the usual case*, the federal court will have completed its function earlier and its quantification of Indian water rights will simply be incorporated in the comprehensive State court decree." Brief for United States 30 (emphasis added).

Similarly, the Navajo Nation states:

"There is no reasonably foreseeable danger that [the] federal action [brought by the Navajo] will duplicate or delay state proceedings or waste judicial resources. While the Navajo claim proceeds in federal court, the state court *can* move forward to assess, quantify, and rank the 58,000 state claims. The Navajo federal action will be concluded long before the state court has finished its task." Brief for Respondent Navajo Nation in No. 81–2147, p. 22 (emphasis added; footnote omitted).

The problem with these scenarios, however, is that they assume a cooperative attitude on the part of state courts, state legislatures, and state parties which is neither legally

required nor realistically always to be expected. The state courts need not "turn their attention" to other matters if they are prompted by state parties to adjudicate the Indian claims first. Moreover, considering the specialized resources and experience of the state courts, it is not at all obvious that the federal actions "will be concluded long before" the state courts have issued at least preliminary judgments on the question of Indian water rights. Cf. 484 F. Supp., at 36.

The McCarran Amendment, as interpreted in *Colorado River*, allows and encourages state courts to undertake the task of quantifying Indian water rights in the course of comprehensive water adjudications. Although adjudication of those rights in federal court instead might in the abstract be practical, and even wise, it will be neither practical nor wise as long as it creates the possibility of duplicative litigation, tension and controversy between the federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights.

*Colorado River*, of course, does not require that a federal water suit must always be dismissed or stayed in deference to a concurrent and adequate comprehensive state adjudication. Certainly, the federal courts need not defer to the state proceedings if the state courts expressly agree to stay their own consideration of the issues raised in the federal action pending disposition of that action. Moreover, it may be in a particular case that, at the time a motion to dismiss is filed, the federal suit at issue is well enough along that its dismissal would itself constitute a waste of judicial resources and an invitation to duplicative effort. See *Colorado River, supra*, at 820; *Moses H. Cone Hospital*, 460 U. S., at 21–22. Finally, we do not deny that, in a case in which the arguments for and against deference to the state adjudication were otherwise closely matched, the fact that a federal suit was brought by Indians on their own behalf and sought only to adjudicate Indian rights should be figured into the balance. But the most important consideration in *Colorado River*, and

the most important consideration in any federal water suit concurrent to a comprehensive state proceeding, must be the "policy underlying the McCarran Amendment," 424 U. S., at 820; see *Moses H. Cone Hospital, supra,* at 16, and, despite the strong arguments raised by the respondents, we cannot conclude that water rights suits brought by Indians and seeking adjudication only of Indian rights should be excepted from the application of that policy or from the general principles set out in *Colorado River.* In the cases before us, assuming that the state adjudications are adequate to quantify the rights at issue in the federal suits,[20] and taking into account the McCarran Amendment policies we have just discussed, the expertise and administrative machinery available to the state courts, the infancy of the federal suits, the general judicial bias against piecemeal litigation, and the convenience to the parties, we must conclude that the District Courts were correct in deferring to the state proceedings.[21]

## V

Nothing we say today should be understood to represent even the slightest retreat from the general proposition we expressed so recently in *New Mexico* v. *Mescalero Apache Tribe,* 462 U. S., at 332: "Because of their sovereign status,

---

[20] In a number of these cases, respondents have raised challenges, not yet addressed either by the Court of Appeals or in this opinion, to the jurisdiction or adequacy of the particular state proceeding at issue to adjudicate some or all of the rights asserted in the federal suit. These challenges remain open for consideration on remand. Moreover, the courts below should, if the need arises, allow whatever amendment of pleadings not prejudicial to other parties may be necessary to preserve in federal court those issues as to which the state forum lacks jurisdiction or is inadequate.

[21] We leave open for determination on remand whether the proper course in such cases is a stay of the federal suit or dismissal without prejudice. See *Moses H. Cone Hospital,* 460 U. S., at 28 (reserving issue). In either event, resort to the federal forum should remain available if warranted by a significant change of circumstances, such as, for example, a decision by a state court that it does not have jurisdiction over some or all of these claims after all.

[Indian] tribes and their reservation lands are insulated in some respects by a 'historic immunity from state and local control,' *Mescalero Apache Tribe* v. *Jones*, [411 U. S. 145, 152 (1973)], and tribes retain any aspect of their historical sovereignty not 'inconsistent with the overriding interests of the National Government.' *Washington* v. *Confederated Tribes*, [447 U.S 134, 153 (1980)]." Nor should we be understood to retreat from the general proposition, expressed in *Colorado River*, that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." 424 U. S., at 817. See generally *Moses H. Cone Hospital*, *supra*, at 13–16. But water rights adjudication is a virtually unique type of proceeding, and the McCarran Amendment is a virtually unique federal statute, and we cannot in this context be guided by general propositions.

We also emphasize, as we did in *Colorado River*, that our decision in no way changes the substantive law by which Indian rights in state water adjudications must be judged. State courts, as much as federal courts, have a solemn obligation to follow federal law. Moreover, any state-court decision alleged to abridge Indian water rights protected by federal law can expect to receive, if brought for review before this Court, a particularized and exacting scrutiny commensurate with the powerful federal interest in safeguarding those rights from state encroachment.

The judgment of the Court of Appeals in each of these cases is reversed, and the cases are remanded for further proceedings consistent with this opinion.[22]

*So ordered.*

---

[22] The motion of the Blackfeet Indian Tribe, filed March 22, 1983, to suspend all proceedings in this Court respecting the water rights of the Blackfeet Indian Tribe, Browning, Mont., and to preclude the Solicitor General or any other attorney of the Department of Justice from purporting to represent that Tribe in these proceedings is denied. The motion of the White Mountain Apache Tribe and the Blackfeet Indian Tribe, filed June 3, 1983, for leave to file a motion to dismiss for lack of *in personam* and subject-matter jurisdiction in this Court over the state-court water rights adjudica-

JUSTICE MARSHALL, dissenting.

In *Colorado River Water Conservation District* v. *United States*, 424 U. S. 800 (1976), this Court recognized a narrow rule of abstention governing controversies involving federal water rights. We stated that in light of "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," *id.*, at 817, "[o]nly the clearest of justifications," *id.*, at 819, will warrant abstention in favor of a concurrent state proceeding. Substantially for the reasons set forth in JUSTICE STEVENS' dissenting opinion, I believe that abstention is not appropriate in these cases. Unlike the federal suit in *Colorado River*, the suits here are brought by Indian Tribes on their own behalf. These cases thus implicate the strong congressional policy, embodied in 28 U. S. C. § 1362, of affording Indian tribes a federal forum. Since § 1362 reflects a congressional recognition of the "great hesitancy on the part of tribes to use State courts," S. Rep. No. 1507, 89th Cong., 2d Sess., 2 (1966), tribes which have sued under that provision should not lightly be remitted to asserting their rights in a state forum. Moreover, these cases also differ from *Colorado River* in that the exercise of federal jurisdiction here will not result in duplicative federal and state proceedings, since the District Court need only determine the water rights of the Tribes. I therefore cannot agree that this is one of those "exceptional" situations justifying abstention. 424 U. S., at 818.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

"Nothing in the McCarran Amendment or in its legislative history can be read as limiting the jurisdiction of the federal courts." *Colorado River Water Conservation District* v.

---

tion proceedings is denied. Treating the papers whereon the motion filed June 3, 1983, was submitted as a motion for leave to file a brief *amicus curiae*, and treating the accompanying papers as a brief *amicus curiae*, leave to file the brief is granted.

*United States*, 424 U. S. 800, 821, n. 2 (1976) (Stewart, J., dissenting). That Amendment is a waiver, not a command.[1] It *permits* the United States to be joined as a defendant in state water rights adjudications; it does not purport to diminish the United States' right to litigate in a federal forum and it is totally silent on the subject of Indian tribes' rights to litigate anywhere. Yet today the majority somehow concludes that it commands the federal courts to defer to state-court water rights proceedings, even when Indian water rights are involved. Although it is customary for the Court to begin its analysis of questions of statutory construction by examining the text of the relevant statute,[2] one may search in vain for any textual support for the Court's holding today.

> "Most of the land in these reservations is and always has been arid. . . . It can be said without overstatement that when the Indians were put on these reservations they were not considered to be located in the most desirable area of the Nation. It is impossible to believe that when Congress created the great Colorado River Indian Reservation and when the Executive Department of this Nation created the other reservations they were unaware that most of the lands were of the desert kind— hot, scorching sands—and that water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised." *Arizona* v. *California*, 373 U. S. 546, 598–599 (1963).

This Court has repeatedly recognized that the Government, when it created each Indian reservation, "intended to deal fairly with the Indians by reserving for them the waters

---

[1] See *ante*, at 549, n. 1 (quoting the statutory text).

[2] See, *e. g.*, *BankAmerica Corp.* v. *United States*, 462 U. S. 122, 128–130 (1983); *Morrison-Knudsen Construction Co.* v. *Director, Office of Workers' Compensation Programs*, 461 U. S. 624, 630–632 (1983); *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564 (1982); *Bread Political Action Committee* v. *FEC*, 455 U. S. 577, 580–581 (1982); *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980).

without which their lands would have been useless." *Id.*, at 600. See *Winters* v. *United States*, 207 U. S. 564 (1908); *United States* v. *Powers*, 305 U. S. 527, 532 (1939); *Arizona* v. *California, supra,* at 600–601; *Cappaert* v. *United States*, 426 U. S. 128, 138–139 (1976). This doctrine, known as the *Winters* doctrine, is unquestionably a matter of *federal*, not state, law. See *ante*, at 571; *Colorado River, supra,* at 813. Its underlying principles differ substantially from those applied by the States to allocate water among competing claimants. Unlike state-law claims based on prior appropriation, Indian reserved water rights are not based on actual beneficial use and are not forfeited if they are not used. Vested no later than the date each reservation was created, these Indian rights are superior in right to all subsequent appropriations under state law. Not all of the issues arising from the application of the *Winters* doctrine have been resolved, because in the past the scope of Indian reserved rights has infrequently been adjudicated.[3] The important task of elaborating and clarifying these federal-law issues in the cases now before the Court, and in future cases, should be performed by federal rather than state courts whenever possible.

Federal adjudication of Indian water rights would not fragment an otherwise unified state-court proceeding. Since Indian reserved claims are wholly dissimilar to state-law water claims, and since their amount does not depend on the total volume of water available in the water source or on the quantity of competing claims, it will be necessary to conduct separate proceedings to determine these claims even if the adjudication takes place in state court. Subsequently the state court will incorporate these claims—like claims under state law or Federal Government claims that have been formally adjudicated in the past—into a single inclusive, binding decree for each water source. Thus, as Justice Stewart wrote

---

[3] See generally Note, Indian Reserved Water Rights: The *Winters* of Our Discontent, 88 Yale L. J. 1689, 1690–1701 (1979).

in dissent in *Colorado River:* "Whether the virtually identical separate proceedings take place in a federal court or a state court, the adjudication of the claims will be neither more nor less 'piecemeal.' Essentially the same process will be followed in each instance." 424 U. S., at 825.

To justify virtual abandonment of Indian water rights claims to the state courts, the majority relies heavily on *Colorado River Water Conservation District*, which in turn discovered an affirmative policy of federal judicial abdication in the McCarran Amendment.[4] I continue to believe that *Colorado River* read more into that Amendment than Congress intended, and cannot acquiesce in an extension of its reasoning. Although the Court's decision in *Colorado River* did, indeed, foreshadow today's holding, it did not involve an Indian tribe's attempt to litigate on its own behalf, 424 U. S., at 820, n. 26. The majority today acknowledges that the question in these cases was "not directly answered," but in fact was "specifically reserved," in *Colorado River*. *Ante*, at 565.

Although in some respects Indian tribes' water claims are similar to other reserved federal water rights, different treatment is justified. States and their citizens may well be more antagonistic toward Indian reserved rights than other federal reserved rights, both because the former are potentially greater in quantity and because they provide few direct or indirect benefits to non-Indian residents.[5] Indians have

---

[4] Although giving lipservice to the balancing of factors set forth in *Colorado River*, the Court essentially gives decisive weight to one factor: the policy of unified water rights adjudication purportedly embodied in the McCarran Amendment. *Ante*, at 552, 569–570. The Court's entire discussion of the applicability in these cases of the four *Colorado River* factors is found in a single vague sentence. *Ante*, at 570. It is worth noting, however, that the Court leaves open the possibility that Indian water claims will occasionally be heard in federal court. *Ante*, at 569.

[5] See Comptroller General of the United States, Reserved Water Rights for Federal and Indian Reservations: A Growing Controversy in Need of Resolution 18 (Nov. 1978) ("Indian reserved water rights present a more pressing problem than Federal reserved water rights. Unlike Federal

historically enjoyed a unique relationship with the Federal Government, reflecting the tribes' traditional sovereign status, their treaty-based right to federal protection, and their special economic problems. Recently the Court reaffirmed "'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" *United States* v. *Mitchell, ante,* at 225, quoting *Seminole Nation* v. *United States,* 316 U. S. 286, 296 (1942). See also *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 168–175 (1973); *Rice* v. *Olson,* 324 U. S. 786, 789 (1945).[6]

One important aspect of the special relationship is 28 U. S. C. § 1362, which embodies a federal promise that Indian tribes will be able to invoke the jurisdiction of federal courts to resolve matters in controversy arising under federal

---

reservations, which are not expected to have large consumptive water demands, many Indian reservations are expected to require significant water quantities to satisfy reservation purposes"). In addition, national forests, national parks, and other federal uses provide benefits to non-Indian residents, including lumbering operations, grazing, recreational purposes, watershed protection, and tourist revenues. See Note, Adjudication of Indian Water Rights Under the McCarran Amendment: Two Courts are Better Than One, 71 Geo. L. J. 1023, 1053–1054 (1983).

[6] Congress has been particularly solicitous of Indian property rights, including water rights, even when it has expanded the governmental role of the States with respect to Indian affairs. In 1953, a year after the McCarran Amendment was passed, Congress authorized the States to assume general criminal and limited civil jurisdiction within "Indian country," but it expressly withheld certain matters, including water rights, from state adjudication. Pub. L. 280, 67 Stat. 588, codified at 28 U. S. C. § 1360(b). The Court held in *Colorado River* that this proviso to Pub. L. 280 did not purport to limit the special consent to jurisdiction given by the McCarran Amendment. 424 U. S., at 812–813, n. 20. But, even assuming that state courts have jurisdiction to adjudicate Indian water claims, the proviso casts serious doubt on the assertion that Congress intended state courts to be the *preferred* forum.

law.[7]  Congress thereby assured Indians a neutral federal forum—a guarantee whose importance should not be underestimated.[8]  The Senate Report noted:

> "There is great hesitancy on the part of tribes to use State courts.  This reluctance is founded partially on the traditional fear that tribes have had of the States in which their reservations are situated.  Additionally, the Federal courts have more expertise in deciding questions involving treaties with the Federal Government, as well as interpreting the relevant body of Federal law that has developed over the years."  S. Rep. No. 1507, 89th Cong., 2d Sess., 2 (1966).

---

[7] The statute provides:

"The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

Enacted in 1966, § 1362 was designed to remove the $ 10,000 jurisdictional amount limitation with respect to these claims.

[8] The majority recognizes that there is "a good deal of force" to the assertion that "[s]tate courts may be inhospitable to Indian rights."  *Ante*, at 567, 566.  Federal officials responsible for Indian affairs have consistently recognized the appropriateness of deciding Indian claims in federal, not state, courts.  See, *e. g.*, H. R. Rep. No. 2040, 89th Cong., 2d Sess., 2 (1966) (describing position of Interior Department); National Water Comm'n, Water Policies for the Future, Final Report to the President and to the Congress of the United States 478–479 (1973).  American Indian Policy Review Commission, Task Force Four, Report on Federal, State, and Tribal Jurisdiction 176 (Comm. Print 1976); American Indian Policy Review Commission, Final Report 333–334 (Comm. Print 1977).

Although the Court correctly observes that state courts, "as much as federal courts, have a solemn obligation to follow federal law," *ante*, at 571, state judges, unlike federal judges, tend to be elected and hence to be more conscious of the prevailing views of the majority.  Water rights adjudications, which will have a crucial impact on future economic development in the West, are likely to stimulate great public interest and concern.  See Note, *supra* n. 5, at 1052–1053.

Section 1362 also assured the tribes that they need not rely on the Federal Government to protect their interests, an important safeguard in light of the undeniable potential for conflicts of interest between Indian claims and other Federal Government claims.[9]

Despite the silence of the McCarran Amendment regarding Indian tribal claims, and the clear promise of a federal forum embodied in § 1362, the Court holds that considerations of "wise judicial administration" require that Indian claims, governed by federal law, must be relegated to the state courts. It is clear to me that the words "wise judicial administration" have been wrenched completely from their ordinary meaning. One of the Arizona proceedings, in which process has been served on approximately 58,000 known water claimants, illustrates the practical consequences of giving the state courts the initial responsibility for the adjudication of Indian water rights claims. Because this Court may not exercise appellate jurisdiction in state-court litigation until after a final judgment has been entered by the highest court of the State, no federal tribunal will be able to review any federal question in the case until the entire litigation has been concluded. The Court promises that "any state-court decision alleged to abridge Indian water rights protected by

---

[9] The Senate Report stated:

"Currently, the right of the Attorney General of the United States to bring civil actions on behalf of tribes without regard to jurisdictional amount, a power conferred on him by special statutes, is insufficient in those cases wherein the interest of the Federal Government as guardian of the Indian tribes and as Federal sovereign conflict, in which case the Attorney General will decline to bring the action.

"The proposed legislation will remedy these defects by making it possible for the Indian tribes to seek redress using their own resources and attorneys." S. Rep. No. 1507, at 2.

If federal courts defer to state-court proceedings, then the Indian tribes will be unable to represent themselves without waiving tribal sovereign immunity from state-court jurisdiction.

federal law can expect to receive, if brought for review before this Court, a particularized and exacting scrutiny commensurate with the powerful federal interest in safeguarding those rights from state encroachment." *Ante*, at 571. If a state court errs in interpreting the *Winters* doctrine or an Indian treaty, and this Court ultimately finds it necessary to correct that error, the entire comprehensive state-court water rights decree may require massive readjustment. If, however, the quantification of Indian rights were to be adjudicated in a separate federal proceeding—which presumably would be concluded long before the mammoth, conglomerate state adjudication comes to an end—the state judgment would rest on a solid foundation that this Court should never need to examine.

The Court acknowledges the logical force of these propositions, but sets them aside because the exercise of concurrent federal-court jurisdiction would create "the possibility of duplicative litigation, tension and controversy between the federal and state forums, hurried and pressured decisionmaking, and confusion over the disposition of property rights." *Ante*, at 569. These possibilities arise, as the Court candidly admits, from a pessimistic assessment of the likelihood that state courts, state legislatures, and state parties will assume a "cooperative attitude." In other words, the state courts might engage in an unseemly rush to judgment in order to give the Indians less water than they fear that the federal courts might provide. If state courts cannot be expected to adhere to orderly processes of decisionmaking because of their hostility to the Indians, the statutory right accorded to Indian tribes to litigate in a federal tribunal is even more important.

In my view, a federal court whose jurisdiction is invoked in a timely manner by an Indian tribe has a duty to determine the existence and extent of the tribe's reserved water rights under federal law. It is inappropriate to stay or dismiss such federal-court proceedings in order to allow de-

terminations by state courts. In the cases before us today, complaints were timely filed in federal court by the Indian Tribes, before or shortly after the institution of state water adjudication proceedings; the state proceedings in Arizona and Montana remain at an early stage. The District Court should therefore grant the Tribes leave to amend the various complaints, where necessary, to seek adjudication of the scope and quantity of Indian reserved water rights and to eliminate other claims; the suits should then proceed in federal court.

Today, however, on the tenuous foundation of a perceived congressional intent that has never been articulated in statutory language or legislative history, the Court carves out a further exception to the "virtually unflagging obligation" of federal courts to exercise their jurisdiction. The Court does not—and cannot—claim that it is faithfully following general principles of law. After all, just four months ago in *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1 (1983), the Court wrote:

> "[W]e emphasize that our task in cases such as this is not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction. Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender . . . the presence of federal-law issues must always be a major consideration weighing against surrender." *Id.*, at 25–26.

Today that "major consideration" is but a peppercorn in the scales, outweighed by the phantom command of the McCarran Amendment. Instead of trying to reconcile this decision with *Moses H. Cone* and other prior cases, the Court

merely says: "But water rights adjudication is a virtually unique type of proceeding, and the McCarran Amendment is a virtually unique federal statute, and we cannot in this context be guided by general propositions." *Ante*, at 571.

I submit that it is the analysis in Part IV of the Court's opinion that is "virtually unique." Accordingly, I respectfully dissent.