Herman GREY, Pauline Grey, Raymond
Juan, Georgene Morgan Seota, and
Mary Josephine Manuel, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 588–84L.

United States Claims Court.

Aug. 9, 1990.

As Amended Aug. 13, 1990.

Philip J. Shea, Phoenix, Ariz., for plaintiffs.

R. Anthony Rogers, Washington, D.C., for defendant.

## OPINION

### MOODY R. TIDWELL, III, Judge:

This action addresses the delivery of irrigation water resources to Native American Allottees residing on the Salt River Indian Reservation. Water resources of the Salt River Valley are controlled by the Salt River Project whose six reservoirs store water from the Salt and Verde Rivers. The stored water is then delivered to the reservation and to more than 1.5 million people living in the Phoenix Metropolitan area.

Plaintiffs are holders of fractional to full interests in various allotments of lands on the Salt River Pima–Maricopa Indian Reservation. They claim damages resulting from the failure of United States government officials "to administer their responsibility to control lawful delivery of irrigation water from the Salt River to the allotted lands of the ... Indian Reservation." Plaintiffs assert that the government had a duty to deliver water to their allotted lands which duty was breached.

The parties presented evidence on two key issues at trial. First, whether this court has jurisdiction over plaintiffs' claims by virtue of a statute or regulation which can be fairly interpreted as mandating compensation by the federal government for failure to deliver surface water to allotted Indian lands. And, if so, whether the failure to deliver water in accordance with *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908) [1] from water stored in the Salt River Reclamation Project area to individual allottees constituted an actionable breach.

Plaintiffs claim entitlement to damages resulting from having to pay higher prices for water deliveries to their lands than others paid for water deliveries to non-reservation lands. After reviewing the evidence presented at trial, and for the reasons that follow, the court finds that plaintiffs are not entitled to recover.

## FACTS

The Salt River valley is part of the arid desert surrounding Phoenix, Arizona. The hot, dry desert climate is incapable of sustaining substantial vegetation without irrigation. The amount of rainfall varies widely. In dry years the flow of the Salt River diminishes sharply, yet rainfall can occur for short intense periods and produce a substantial run-off resulting in flooding along the river. Without regulation of the stream flow floods cause injury to landowners. Flood water is lost instead of being stored for delivery during draught periods.

The Pima and Maricopa tribes have a long history [2] of diverting water from the Salt River to irrigate their lands and grow crops. *Arizona v. California,* 373 U.S. 546, 552, 83 S.Ct. 1468, 1473, 10 L.Ed.2d 542 (1963). In fact, Father Eusebio Kino found ancestors of the Pima Indians prac-

---

**1.** *Winters,* a judicially derived "law," held that the withdrawal of federal land from the public domain for a federal purpose reserved, by implication, appurtenant water, then unappropriated, to the extent necessary to accomplish the purpose that the land was set aside. This means of appropriating water became known as the Winters Doctrine or Winters Right. The Winters Doctrine has been applied to all lands set aside as indian reservations. The principle was reaffirmed in *Arizona v. California,* 373 U.S. 546, 595–601, 83 S.Ct. 1468, 1495–98, 10 L.Ed.2d 542 (1963), and later in *Washington v. Fishing Vessel Ass'n,* 443 U.S. 658, 685–86, 99 S.Ct. 3055, 3074,

61 L.Ed.2d 823 (1979). In *Winters* the Supreme Court recognized reserved rights in an Indian tribe apparently because of unceded aboriginal sovereignty over that water, *i.e.,* a tribe's rights to sufficient water to support a homeland on the reservation.

**2.** The history recounted in the facts of this case is necessarily brief. Much of the history presented applies not only to the Pima–Maricopa reservation, but to the nearby Gila River reservation as well.

ticing fairly sophisticated irrigation agriculture in the nearby Gila River Valley during his visits to the area in the 1690's.[3] The Indians used rock and brush dams to divert water from rivers to canals and onto arid lands to irrigate corn, beans, squash, and melons. By the time Arizona became a territory under the sovereignty of the United States in 1863 the Pima and Maricopa Indians were a self sufficient, pastoral people. United States government officials reported that the Indians had developed an agricultural society with entrepreneurial skills that relied on irrigation of tribal lands to produce crops for consumption and sale.

Later immigrants and settlers established farms and displaced the Indians. As early as 1870 farming operations of the Pima and Maricopa Indians along the Gila River were disrupted by upstream diversions of water by white farmers and miners. In 1878, Captain Adana A. Chaffee, of the United States Army, reported that settlers south of the Salt River were attempting to take lands of the Pima Indians who lived and farmed by the river. Chaffee described the actions of the settlers as "nothing more or less than a legal steal of about a thousand acres of improved land, or rather, the improvements put upon the lands by the Indians ..." Letter from Captain Adana Chaffee to the Assistant Adjutant General, Headquarters, Department of Arizona, Prescott Barracks (Nov. 24, 1878). During this same time period the Indians were charged with trespass because some of their animals grazed on lands white farmers had "settled." A month later General Erwin McDowell reacted to Captain Chaffee's report:

There is no question in my mind as to the duty of the United States Government toward these Indians, who did more to give peace and security to Arizona than all the white troops combined, and who are not nomads but farmers and intelligent people, fully susceptible of being civilized. The United States should at once take measures, by injunction or otherwise, to restore to these Indians the

rights to water to which they are entitled.

But as it will take time to do this and as the present exigency does not admit of delay I ask that an additional reservation be at once declared for them, ...

Letter from General Erwin McDowell to Headquarters Military Division of the Pacific and Department of California (Dec. 23, 1878). In response, by Executive Order, and not by treaty, President Rutherford B. Hays established a reservation of approximately 51,000-acres. Executive Order, June 14, 1879. The reservation has a southern boundary along the middle of the Salt River. The Indians relocated from the Gila River Valley to the reservation located south and west of the confluence of the Salt and Verde Rivers. The reservation is now adjacent to the Phoenix Metropolitan area and its borders abut the cities of Scottsdale, Mesa, and Tempe, Arizona.

From the creation of the reservation in 1879 the Indians diverted Salt River water for irrigation of lands on the north side of the Salt River by building more brush and rock dams. The Indian system for water diversion was rendered ineffective by the construction of Granite Reef Dam and Arizona Canal in 1884. The Arizona Canal runs essentially from east to west through the Salt River Indian Reservation, continues for a total distance of forty miles across the Salt River Valley, and constitutes the northern limit of the lands irrigated by river water. In July 1884 a lateral from the Arizona canal, called the Indian Ditch, was constructed to provide a source of water for Indian lands.

In 1902 the Secretary of the Interior was authorized to withdraw Salt River Valley lands for construction of the Salt River Federal Reclamation Project. In 1903 a water user's association was formed which did not include the Indian reservation in the Project area and in 1904, the Secretary entered into a contract with the user's association for repayment of Project costs. The contract provided that only members

---

**3.** *Kino's Memoir of Pimeria Acts* (2d ed. 1948), Father Kino's history is the first written account

by Spanish explorers visiting the Salt River area.

of the user's association could receive water from the Salt River Project.

In 1905 a lawsuit was filed in Arizona territorial court to clarify water rights in the Salt River Project area. The federal government filed claims on behalf of the Salt River Reservation asserting the Indians' prior appropriation rights under state law. These claims were not amended by the Justice Department following the landmark decision in *Winters*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), because of its position that *Winters* applied only to reservations created by treaty, not executive order.

In 1910 the Arizona territorial court issued what became known as the Kent Decree that defined water rights in the Salt River Project area.[4] Records of Frank P. Trott the court-appointed water commissioner revealed that the Indians received 500 miners' inches [5] of water annually from 1895 to 1910. Judge Kent gave the Indians additional water by increasing the flow of water to the Indians from 500 to 700 miner's inches but reduced the amount of reservation land entitled to irrigation. The Kent Decree limited the claims of Indian farmers to natural flows with no rights to the use of stored water during periods of draught.

The Salt River Project first became operational in 1911. The original infrastructure on the Salt River Project included the Roosevelt Dam, the Granite Reef Diversion Dam and the Diversion Canals. These facilities were purchased or constructed by the United States between 1905 and 1913. In later years the water storage capacity of the Salt River Project was enhanced by the construction of five additional dams and by ground water pumping from wells. Mormon Flat Dam on the Salt River, with a capacity of 57,000 acre feet, was completed in 1925. Horse Mesa Dam was added in 1927 with a capacity of 245,000 acre feet and in 1930 Stewart Mountain Dam the last dam constructed on the Salt River, was added with a capacity of 69,000 acre feet. Bartlett Dam in 1939 and the Horseshoe Dam in 1946 added 318,238 acre-feet of storage capacity on the Verde River to the Salt River Project water system.

The Salt River Project controls a finite resource of approximately 2,168,258 acre-feet of stored water. In wet years additional overflow or spill water is available when the reservoirs have reached full capacity. Pumped ground water also augments the storage capacity of the Salt River reservoir system. The maximum ground-water delivery capacity is 738,595 acre-feet per year from wells in the Salt River Valley. From the combination of reservoir and pumped water, the Salt River Project delivers approximately 1.2 million acre-feet of water per year to water users in the Salt River Valley.

In 1913 the Secretary asked the water users association to determine the size of the Salt River Project because it was projected that there would not be sufficient water to irrigate all member lands. During that same year the local Bureau of Indian Affairs (BIA) agent enrolled some Salt River Indian lands that had been allocated water rights under the Kent Decree for membership in the water users association. Later, when it became apparent that allotted reservation lands were entitled to water without participating as paying members of the Salt River Project, the BIA withdrew the request to admit reservation lands to the water users association.

In an appropriation act for the Bureau of Indian Affairs, Act of May 18, 1916, ch. 125 39 Stat. 123, 130 (1916), Congress directed the Secretary to provide water for 6,310 acres of newly allotted Indian lands but did not state how much water was to be deliv-

---

4. *Hurley v. Abbott*, Third District Arizona Territory No. 4564, filed March 1, 1910 (Defendant's Exhibit No. 169).

5. Miners' inches is a term that describes the quantity in a flow of water. Experts testified at trial that the definition of a miners' inch of water varies from state to state. In Arizona 40 miners' inches is equal to one cubic foot per second flowing continuously for one year. Water is now measured in acre feet. An acre foot is enough water necessary to cover an acre to the depth of one foot. In ordinary terms an acre foot of water is 43,560 cubic feet. A cubic foot contains 7.4805 gallons of water therefore, an acre foot of water is 325,850 gallons.

ered or from what source. The Secretary and the Salt River Project asserted that there was no Project water available to irrigate the 6,310 acres. Public notice was issued in 1917 on the official opening of the Salt River Project and on September 6, 1917 the Secretary officially released operation and maintenance responsibility for the Salt River Project to the water users' association. Three other public notices announced the addition of new divisions to the Project but despite the addition of other water users in the new divisions no additional Indian lands were included in the area served by the Salt River Project.

From 1917 to 1935 BIA attempted to obtain alternate water sources for the 6,310 acres of Indian allotment. During the same time period, the water users' association built the three smaller dams, *i.e.*, Horse Mesa Dam, Mormon Flats Dam, and Stewart Mountain Dam, all located below Roosevelt Dam. Meanwhile, the Secretary approved the pumping of water from wells on Project lands and the concrete lining of canals to prevent seepage losses. By 1935 the Secretary, in consultation with the Salt River Project, decided to build the Bartlett Dam on the Verde River. Construction of that dam provided additional water for use on the Indian reservation and in the Salt River Project. The Bartlett Dam Agreement provided 20,000–acre feet of water annually for use on the 6,310 acres of allotted lands on the Indian reservation but subsequent attempts by the tribe to have the United States reopen the Kent Decree to secure water rights under the *Winters* doctrine were unsuccessful.

Horseshoe Dam was completed in 1946 under an agreement between the Salt River Project and Phelps Dodge Corporation. Subsequently, the Secretary approved a contract between the Salt River Project and the federal government which provided a complex method for calculation of the storage rights of water impounded by Bartlett Dam after completion of the Horseshoe Dam. The Indians soon discovered that the agreed upon accounting system ultimately worked to the tribes' disadvantage. The accounting formula resulted in a reduction in tribal rights to stored water

credits as the reservoirs behind the dams filled to their capacities. The tribe did, however, receive 20,000 additional acre feet of water for 631 allotments as a result of the Bartlett Dam Agreement. All of the Indian allotments—804 receiving water under the Kent Decree and 631 receiving water under the Bartlett Dam Agreement— are located south of the Arizona Canal.

During the 1950's the Salt River Project executed agreements with the cities of Phoenix, Scottsdale and Tempe as Project lands changed from agricultural to urban use. The Project committed to deliver ever increasing amounts of water to the urban purchasers.

In 1952 Congress passed the McCarran Amendment that authorized the adjudication of federal water rights in state court proceedings pursuant to state law. The McCarran Amendment, Pub.L. No. 495, 66 Stat. 549, 560 (1952), 43 U.S.C. § 666 (1982), waived the sovereign immunity of the United States, and provided for state courts jurisdiction to adjudicate Indian water rights. *See Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 548–53, 103 S.Ct. 3201, 3204–06, 77 L.Ed.2d 837 (1983); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 802–13, 96 S.Ct. 1236, 1239–44, 47 L.Ed.2d 483 (1976). Thus, the quantity of water available to the Indians is determined by the Arizona state court.

In 1951, the Salt River Pima–Maricopa Indian Community, in its own right, on behalf of the constituent tribes, and on behalf of its individual members, sued the United States before the Indian Claims Commission. The suit claimed, among other things, that the United States in its role as guardian had mismanaged the Indian's water and water rights. On December 15, 1976 the case was transferred from the Indian Claims Commission to the United States Court of Claims, becoming Docket No. 291. Later, in 1978 the President of the United States signed an act that adjusted the southern boundary of the Salt River Pima–Maricopa Indian Reservation. Pub.L. No. 95–399, 92 Stat. 851 (1978). The Act also satisfied the property account-

ing claims asserted by plaintiffs and caused the claims to be abandoned. In January, 1979 plaintiffs filed an amended petition and stated that the only remaining claim was an accounting for deprivation of water rights. On July 2, 1982 the Court of Claims entered an order granting judgment for plaintiffs in the amount of $13 million dollars. The settlement agreement as signed by the parties provided:

> 2. All claims for money damages for failure to deliver water to the plaintiffs' tribal lands from 1879 to the date of entry of final judgment herein based on the claims asserted by plaintiffs in their pleadings, or which they could have asserted for money damages in their pleadings, are hereby extinguished.

Stipulation for Entry of Judgment, filed June 16, 1982, at 1.

Today, the allotment lands of the Salt River reservation present a mosaic with all levels of cultivation in view. Some allotments are under cultivation with crops being harvested each year, others lie fallow and many are not utilized to the fullest extent. At trial several reasons were given for lands remaining idle. Some allotments were taken out of production because they were too close to the city of Scottsdale and the Community College to allow aerial spraying. Consequently, high-value crops such as cotton could not be grown. Other allotments participated in federal set-aside programs whereby owners are paid by the government not to farm. Still other allotments remained idle because the allottees could not agree to lease the lands for farming. Finally, many of the allotments have substandard or non-existent facilities to distribute irrigation water received.

Two decades of litigation and negotiation failed to produce a settlement of the tribe's water rights which led to passage by the Congress of the Salt River Pima–Maricopa Indian Community Water Rights Settle-

ment Act. Pub.L. No. 100–512, 102 Stat. 2549 (1988) (Settlement Act). The statute provided that the Indian community is entitled to 122,400 acre-feet of water per year from both surface water of the Salt River Project and ground water pumped on the reservation. The Settlement Act instructed the Secretary to construct new diversion and delivery facilities to make river water available to lands north of the Arizona canal that are at a higher elevation than the lands south. Until the new facilities are constructed lands north of the canal can obviously only use pumped ground water. The Act also established a fund to provide money to rehabilitate the existing irrigation system and construct additional facilities on the reservation. The government contributed $47.4 million to the community fund for design, rehabilitation and construction of new facilities to put the Indians' existing water, as well as additional water to beneficial use.[6] Paragraph 4 of the Settlement Act describes the irrigation needs to permit crop cultivation. According to the Act crops can be successfully cultivated with 4.5 acre feet of water per acre instead of 5.4 acre feet per acre previously regarded as normal in the Salt River Valley. The Settlement Act also extinguished claims for water by the Indian community and individual allotment owners and mitigated any prejudice incurred by Indians who refrained from litigation during several years of efforts concentrated on settlement negotiations.

### DISCUSSION

#### I. Jurisdiction

█ Plaintiffs seek relief based on the theory that defendant breached an obligation to them founded on statutory duty. The Tucker Act confers jurisdiction on this court to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Con-

---

**6.** The water made available to the tribes will not be used exclusively for irrigation on the reservation. The Settlement Act also provides that the tribes will lease 13,300 acre feet of water per year to the city of Phoenix. The lease provides that the Indian community will supply water for the term from January 1, 2000 to December 30, 2098 in return for $16,000,000. Salt River Pima–Maricopa Indian Community Water Rights Settlement Act, Pub.L. No. 100–512, 102 Stat. 2554 § 8(a) (1988).

gress or any regulation...." 28 U.S.C. § 1491(a)(1) (1982). Because this claim is brought by individual indians and not the tribe, § 1491 defines this court's jurisdiction.[7]

Plaintiffs contend that sections of the General Allotment Act, dealing with irrigated agricultural allotments, 25 U.S.C. §§ 331, 338 (1988); and the regulations governing irrigation of Indian lands, 25 C.F.R. 171 (1989); in combination with "reclamation laws" give rise to the existence of an obligation akin to a special trust relationship between the United States and Indian Allottees under which their claim is actionable. Defendant does not agree that this court has jurisdiction over plaintiffs' claims because there is no statute or regulation which can be fairly interpreted as mandating compensation. The United States Claims Court may exercise its Tucker Act jurisdiction only where there is an independent source of substantive law which can be fairly interpreted as mandating compensation for money damages sustained. *United States v. Mitchell,* 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983) (*Mitchell II*); and *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). This court's predecessor, the United States Court of Claims, also held that the Tucker Act granted jurisdiction only when an independent substantive right for money damages existed. *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967).

### 1. *United States v. Mitchell*

In *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*); and *Mitchell II,* 463 U.S. 206, 103 S.Ct. 2961, the Supreme Court set forth the standard used to determine whether this court has jurisdiction to hear a claim for breach of statutory duty. In *Mitchell I,* the Supreme Court reversed the United States Court of Claims and held that the General Allotment Act, 25 U.S.C. § 331 (1988), was not sufficient basis for a claim that the government breached any fiduciary duty owed to the Indians. The Court determined that the General Allotment Act "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Mitchell I,* 445 U.S. at 542, 100 S.Ct. at 1353. The case was remanded to the Court of Claims for a determination if any other statute provided the plaintiffs with substantive rights. On remand, the Court of Claims found that other statutes and regulations could sustain a "trust" relationship between the government and the Indians. Specifically, the timber management statutes, accompanying regulations, and right-of-way provisions created a substantive right enforceable by money damages. *Mitchell v. United States,* 229 Ct.Cl. 1, 664 F.2d 265 (1981).

In *Mitchell II,* the Supreme Court upheld the Claims Court decision and found that the combination of statutes and regulations evinced congressional intent to create a "trust" relationship between the United States and recognized Indian tribes.[8]

---

**7.** Indian claims referred to in 28 U.S.C. § 1505 (1982), are not applicable to actions brought by individual Indians. *See Fields v. United States,* 191 Ct.Cl. 191, 423 F.2d 380 (1970).

**8.** The existence of a trust relationship does not mean that any and every claim by the Indians "necessarily states a proper claim for breach of trust." *Pawnee v. United States,* 830 F.2d 187, 191 (Fed.Cir.1987), *cert. denied* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). The mere allegation of a breach of trust is not sufficient to state a claim within this court's jurisdiction. The general relationship between the United States and the Indians is not comparable to a private trust-type relationship. *Eastern Band of Cherokee Indians v. United States,* 16

Cl.Ct. 75, 78 (1988). Rather, the relationship has traditionally been understood as one of guardian-ward. *Mitchell II,* 463 U.S. at 234, 103 S.Ct. at 2977 (Powell, J., Dissenting); *Klamath Indians v. United States,* 296 U.S. 244, 254, 56 S.Ct. 212, 217, 80 L.Ed. 202 (1935). The nature of the guardian-ward relationship implies that at some point in time, the ward will assume responsibility for handling its own affairs. In contrast, a private trust relationship is static with all encompassing duties on the trustee. Over the years Congress has enacted numerous statutes benefitting the Indians, some statutes are fairly characterized as placing trust responsibilities on the government. Other statutes are guardian in nature because they contemplate

The court concluded that the Secretary controlled virtually every stage of the timber sale process and that the timber management statutes "establish the comprehensive responsibilities of the Federal Government" to exercise " 'literally daily supervision over the harvesting and management of tribal timber.' " *Mitchell II*, 463 U.S. 206, 222, 103 S.Ct. 2961, 2971, 77 L.Ed.2d 580 (1983) (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 147, 100 S.Ct. 2578, 2585, 65 L.Ed.2d 665 (1980)). By undertaking that responsibility, the United States also undertook a duty to handle it properly as measured generally against a very high standard.

This court must now examine the legislative and regulatory schemes, as presented by the plaintiffs, to determine if there are sufficient "pervasive" or "comprehensive" controls to create a fiduciary relationship.

## 2. *Pre–1988 Statutes and Regulations*

■ An examination of the pre–1988 statutes and regulations cited by plaintiffs fails in our opinion to establish the trust relationship contemplated by *Mitchell II*. Section 331 is part of the General Allotment Act of 1887. It provides for the allotment of irrigable and grazing lands for Indians living on reservations. 25 U.S.C. § 331. Section 338, repealed in 1928, required the Secretary to submit a cost accounting to Congress of survey and allotment work performed. These general allotment sections are the same type that were rejected by *Mitchell I* as insufficient to create a trust relationship. Nothing in §§ 331 or 338 suggest that Congress intended to divide and convey tribal water rights to individual allottees as it did with tribal lands. The General Allotment Act was held to create only a limited or bare trust relationship that did not impose any duty on the government to manage resources on allotted lands. *Mitchell I*, 445 U.S. at 543, 100 S.Ct. at 1354. More specifically, the General Allotment Act does not

impose any duty on the Government to manage the water on each individual allotment.

The regulations governing irrigation of Indian lands are directed at the operation and maintenance of the water delivery system. 25 C.F.R. part 171 (1989). Under the regulatory scheme the government sets rates paid for water; assesses and collects fees for maintenance; and delivers water to the boundary of individual farm units. 25 C.F.R. § 171. Allottees determine how to irrigate their respective farms and are responsible for the distribution of water on their individual allotment.

This case differs from *Mitchell II* both as to the resource in question, and how it was managed. The difference is critical when examined in light of the trust corpus requirement. In *Mitchell II*, the Court found a general fiduciary obligation with respect to the management of timber resources on allotted lands. Timber assets on reservations resemble a trust corpus because they must be managed in such a way as to conserve the asset while maximizing income by allowing mature timber to be harvested and sold. The government must assume the duty of preserving the principal (timber), generating income (timber sales), and disbursing profits to individual allotment holders. The statutory scheme in *Mitchell II*, was so pervasive that even individual Indians were precluded from conducting logging operations on their own allotment.

■ The government did not assume, nor does the law provide for similar responsibilities in this case. No evidence has been presented that the government failed to deliver the water the Indians were entitled to under the Kent Decree and the Bartlett Dam Agreement. Plaintiff did present evidence that water was priced differently than water available to members of the Salt River Project.[9] The govern-

---

active participation by the Indians in the decision-making process.

9. Prices for irrigation water on the Pima–Maricopa are set in accordance with 25 C.F.R. § 171.1 (1989). The prices are independent

from prices charged by the Salt River Project. Rates charged plaintiff are published from time to time in the Federal Register. The rate charged includes an assessment for "normal operation and maintenance" of the water delivery

ment fulfilled its duty by delivering the tribe's reserved water right to the delivery points designated by individual allottees. Agents of the government are required to "establish the method of and procedures for the delivery of the available irrigation water—[and] endeavor to apportion the water ... on a fair and equitable basis between all ... water users entitled to the receipt of irrigation water." 25 C.F.R. § 171.6(a). Presumably, the tribe exercised its sovereignty in determining which allotments were entitled to a portion of the finite amount of water available.[10] The allottees then exercised discretion in determining when they wanted water and how much water would be used to irrigate their allotments. Also, individual Indians could lease their ground and corresponding water to non-Indian commercial farmers.

There are other distinct differences between *Mitchell II* and this case. *Mitchell II* determined that allottees could recover for economic damage incurred in the management of their timber allotments. Plaintiffs farm allotments in this case were not directly managed by the defendant. Plaintiffs were free to farm their own allot-

ment, let the ground lie fallow for any number of valid, intentional reasons, or lease it to others. Proximity to nearby residential communities and government subsidy to Indians who withheld allotments from agricultural production are other reasons why the defendant lacked the control and responsibility that was so pervasive in *Mitchell II*. In *Mitchell II* only the government could contract for the cutting of timber on Indian lands. The use of water on plaintiffs' land in this case was not subject to the extensive "daily supervision" and control required by the court in *Mitchell II*. The government's role in irrigation of plaintiffs' lands is not pervasive nor are its responsibilities comprehensive. The statutes and regulations set forth the government's responsibility to provide water to tribal lands. The statutes and regulations cited by plaintiffs do not contain an explicit and detailed enumeration of duties sufficient permit this court to impose a "trust" relationship contemplated in *Mitchell II*. Congress simply did not intend or imply that defendant act as a trustee with responsibility for irrigating each individual allotment.[11]

---

systems found on the reservation. 25 C.F.R. § 171.1(f).

Similarly, Salt River Water Users Association prices its water to include maintenance and operation costs. The price paid by non-Indians is subsidized by revenues from generating electricity at the various dams in the Salt River Project. The Salt River Project delivers Kent Decree and Bartlett Dam Agreement water to the Salt River Indian Reservation free of charge.

10. Prior to 1915, 24,120 acres of the reservation had been allotted into 804 thirty-acre allotments. Each allotment consisted of ten acres of irrigable and twenty acres of non-irrigable (grazing) land. Water for the 8,040 acres of irrigable land was provided by the Kent Decree. Later, in 1917, 631 allotments of ten acres each were designated by the Secretary of the Interior. Water for use on the 631 allotments was provided by the Bartlett Dam Agreement in 1935. The twenty-acre grazing allotments were not entitled to water for irrigation.

Regulation of the use and disposition of private property within the reservation is provided for by the Constitution and by-laws of the Salt River Pima–Maricopa Indian Community. The rights of the community council include the power:

Generally, to provide for the proper use and development and prevent the misuse of the

lands, natural resources, and other public property of the Salt River Pima–Maricopa Indian Community;

Constitution and By-Laws of the Salt River Pima–Maricopa Indian Community Art. III § 5(d) (Pl.Ex. 52). Although all allottees with ten-acre irrigable allotments are entitled to an equal share of water, the tribe assumed responsibility to prevent the misuse of water by preventing the sale, lease or disposition of land without the consent of the Indian community. The exercise of this power by the tribe is consistent with exercise of this power by the tribe is consistent with the notion that Indian allotments are held in trust for the benefit of the allottee. Water acquired by virtue of the *Winters* right, however, is held for the benefit of the entire tribe and must, therefore, be allocated equally among all holders of irrigable allotments.

11. This court is aware of other statutes regarding the irrigation of allotted Indian lands not cited by the parties. 25 U.S.C. §§ 381–390. These statutes are consistent with the analysis presented in this opinion. Section 382 provides that "no lien or charge for construction, operation or maintenance" of reclamation projects shall be created against Indian lands. Thus, plaintiffs receive water from the Salt River Project under the Kent Decree and Bartlett Dam

### 3. *Reclamation Laws*

The primary purpose of the Reclamation Act of 1902 was to provide for construction and operation of water storage and timed release Projects on federal lands under the control of the Secretary. The Supreme Court has held that "the [Reclamation] Act clearly provided that state water law would control in the appropriation and later distribution of the water." *California v. United States*, 438 U.S. 645, 664, 98 S.Ct. 2985, 2995, 57 L.Ed.2d 1018 (1978). The Supreme Court has also held that the government acts simply as a carrier and distributor of water. *Ickes v. Fox*, 300 U.S. 82, 95, 57 S.Ct. 412, 416, 81 L.Ed. 525 (1937). After reaffirming the foregoing principle, that the government acts as a distributor of water, the Supreme Court stated that "[T]he property right in the water right is separate and distinct from the property right in the reservoirs, ditches or canals." *Nebraska v. Wyoming*, 325 U.S. 589, 614, 65 S.Ct. 1332, 1349, 89 L.Ed. 1815 (1945).

██ Finally, the Supreme Court found that Congress has required:

... the Secretary of the Interior to carry water on at least two shoulders when it delegated to him both the responsibility for the supervision of the Indian tribes and the commencement of reclamation projects in areas adjacent to reservation lands.... The Government does not 'compromise' its obligation to one interest that Congress obliges it to represent by the mere fact that it simultaneously performs another task for another interest that Congress has obligated it by statute to do.

*Nevada v. United States*, 463 U.S. 110, 128, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983). The parties presented extensive evidence on the government's participation in the creation of the Salt River Valley Water Users' Association. None of the evidence presented contemplated that the Interior Department would have complete control over water distribution. Section 4 of the Reclamation Act authorizes the Secretary to contract for the construction of an irrigation Project but also states, at section 8:

Nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383 (1982). Congress did not intend to give the Secretary total control of the water in the Salt River or any other reclamation Project. The Secretary's duty to store water and construct irrigation facilities is limited by the rights of others to the use of the water. The reclamation laws did not vest in the United States ownership of any water rights except for those properly appropriated and put to beneficial use under the *Winters* Doctrine. Moreover, it must be borne in mind that under the *Winters* Doctrine the federal government acting on its own behalf, or for a tribe, does not have a totally unfettered right to appropriate water, especially to the detriment of prior perfected water rights after the individual withdrawal and appropriation of previously unappropriated water. To the extent that all of the water in any river or basin is now fully appropriated, which is oftentimes the case, and additional water is sought over and above,

Agreement without incurring costs for maintenance of the project's storage and delivery systems. Plaintiffs were responsible, however, for a portion of the cost to deliver water within the Indian reservation. 25 C.F.R. § 171.1(f). Section 386 provides that the Secretary may require owners of irrigated allotments to begin partial reimbursement for construction charges arising from irrigation systems constructed on the res-

ervation for the benefit of the Indians. These two sections (§ 382 and § 386) may provide a partial explanation of the cost differential for water delivered to allotments on the reservation. Because the parties presented no evidence on the pricing of water, the court makes no finding as to the effect of these statutes or regulations regarding the differing prices of water.

and/or for a different purpose, than the water initially appropriated, the United States in accordance with *Winters* must stand in line with other aspiring water users before the appropriate state or compact water allocation board. Thus, the reclamation laws do not provide a basis for plaintiffs' claim that the United States has created a comprehensive scheme and assumed elaborate control over the exploration of water resources. The reclamation laws are not sufficiently pervasive to create the fiduciary relationship defined by the court in *Mitchell II.*

### 4. *Salt River Water Rights Settlement Act*

The 1988 Settlement Act confirmed a comprehensive settlement agreement between the Salt River Indian Community and the state of Arizona, the Salt River Federal Reclamation Project, large water districts, as well as all of the cities in the Salt River Valley. Plaintiffs argue that the Settlement Act provides jurisdiction for this court to resolve the allottee's claims for damage now pending in the current cause of action. The language of the Settlement Act provides otherwise. In section 2, Congress made specific findings and declared that "the policy of the United States, in fulfillment of its trust responsibility to Indian tribes, ... [is] to settle, wherever possible, the water rights claims of Indian tribes without lengthy and costly litigation...." Congress further found that the United States "obtained water entitlements ... pursuant to the Kent Decree of 1910, ... the Bartlett Dam Agreement of 1935" and "has filed claims for the community's water rights in the ... Superior Court of the State of Arizona." The Settlement Act then authorized the actions and made appropriations necessary for the United States to perform its obligations to the community as provided by the statute. No part of the Settlement Act refers to any form of relationship between the United States and *individual allottees.* The Act defined the government's duty to the Indian *tribes* that constitute the Salt River Pima–Maricopa Indian Community.

The Settlement Agreement and the Settlement Act resolved the Salt River Indian water rights litigation in several cases pending in the United States District Court of Arizona. The statute then stated a procedure to resolve any remaining claims of individual allottees and the Indian community. The Agreement and Act, however, have no impact on the case currently before this court. Individual indian allottees were not parties to the settlement agreement. Since the individual allottees did not give releases as part of the settlement, the non-indian users of Salt River water resources feared subsequent litigation. To avoid future law suits by individual allottees, and to put an end to perpetual litigation, the Settlement Act extinguished prospective claims of Indian allotment owners. In § 10 of the Act Congress expressly provided for resolution of allottees claims, arising after the 1991 implementation date, in the United States Claims Court. The Act thus protected the parties to the Settlement Agreement and individual allottees from future litigation for deprivation of water rights.

■ Individual allottees with existing claims or grievances do have the opportunity to bring an action in this court when their claims are based on a substantive right found in "the Constitution ... any act of Congress, or any regulation ..." 28 U.S.C. § 1491; *Mitchell II,* 463 U.S. at 216, 103 S.Ct. at 2967. The Settlement Act at issue here provides relief for claims arising out of the Settlement Agreement. Section 10(a)(1) of the Act distinguished these claims as "claims ... for deprivation of water rights through December 31, 1991 ..." 102 Stat. 2549, 2256 (1988). Thus, the Act recognized claims that could arise as a result of the Settlement Agreement. The Settlement Act provided no enforceable substantive right that would support plaintiffs' claims for failure to deliver water in the past. Simply stated, the Settlement Act provided jurisdiction for this court to hear claims extinguished by the Act but, based on a substantive right found elsewhere in the statutes or regulations. The Act does not in and of itself provide a jurisdictional basis for claims arising prior

to 1991 that have no other statute mandating compensation.

The legislative history of the Act indicates congressional intent to mandate compensation to allottees for future money damages sustained. When introduced in the House of Representatives, the Bill (H.R. 4102) provided:

> SEC. 10. CLAIMS EXTINGUISHMENT: PAYMENTS; WAIVERS AND RELEASES.
>
> (a)(1) There are hereby extinguished:
>
> (A) all claims of Allottees which are, or which may have been, asserted in Herman Grey and others versus United States, Docket Numbered 588–84L, in the United States Court of Claims; [this very case]
>
> (B)(i) all claims of water rights or injuries to water rights (including water rights in ground water, surface water, and effluent), from time immemorial to the effective date of this Act; and
>
> (ii) any and all future claims of water rights (including water rights in ground water, surface water, and effluent), from and after the effective date of this Act, which such Allottees may have against the United States; the State of Arizona, and any agency or political subdivision thereof; or any other person, corporation, or municipal corporation, arising under the laws of the United States or the State of Arizona.
>
> (2) The Allottees, individually or as a class, shall be entitled to maintain an action against the United States in the United States Court of Claims pursuant to section 1491 of title 28, United States Code, to recover damages, if any, for the extinguishment of the claims effected by this subsection.

H.R. 4102, 100th Cong., 2d Sess. § 10(a) (1988). Thus, the original version of the proposed statute contained a reference to this case in § 10(a)(1)(A). After the Bill was reported from the House Committee on Interior and Insular Affairs, but before enacted by the full House of Representatives, it was amended. As passed and signed by the President, § 10(a) reads:

> SEC. 10. CLAIMS EXTINGUISHMENT; WAIVERS AND RELEASES.
>
> (a)(1) There are extinguished—
>
> (A) all Allottees' claims against the United States for damages for deprivation of water rights through December 31, 1991;
>
> (B) all Allottees' claims against all persons other than the United States for damages for deprivation of water rights through December 31, 1991, for which damages are not recoverable under subparagraph (a)(1)(A) of this section; and
>
> (C) all rights of Allottees to assert claims against the United States and all other persons for declaratory, injunctive or other relief for the determination or enforcement of water rights for allotted lands, including rights to surface water, ground water, and effluent.
>
> (2) For purposes of paragraph (a)(1) of this section claims for water rights include all claims under Federal and State laws (including claims for water rights in ground water, surface water, and effluent) which may otherwise have been enforceable by money damages, declaratory relief, injunction, or other relief.
>
> (3) The benefits realized by the Allottees under this Act shall constitute full and complete satisfaction of all Allottees' claims for water rights under Federal and State laws (including claims for water rights in ground water, surface water, and effluent) that may accrue after the authorizations contained in paragraph (b)(1) of this section have become effective and which would otherwise have been enforceable by money damages, declaratory relief, injunction, or other relief.
>
> (4) Consent is given to Allottees to maintain actions, individually or as a class, against the United States in the United States Claims Court pursuant to section 1491 of title 28, United States Code, to recover damages, if

any, for the extinguishment of claims effected by subparagraphs (a)(1)(A) and (a)(1)(B) of this section: *Provided, however,* That any claim for damages for rights extinguished by subparagraph (a)(1)(B) of this section shall not be joined in the same action as a claim for damages for rights extinguished by subparagraph (a)(1)(A) of this section. 102 Stat. 2549, 2556–57. As conceived, the Act contemplated "extinguishment" of this case and others like it brought by individual allottees. The law as enacted in final form extinguished all allottees claims against the United States for damages for deprivation of water rights through December 31, 1991. Noticeably absent in the statute is the reference to this case found in earlier drafts. The Act gives consent to the allottees to bring suit against the United States to recover damages resulting from "deprivation of water rights" claims. The language of § 10 reveals that Congress may have assumed some valid claims were in existence. Section 10 provides a forum for resolution of valid pre-existing claims. The Settlement Act does not, however, create a substantive right for claims having no other jurisdictional basis.[12] In this case plaintiffs have not shown an independent substantive right to money damages. The legislative history is silent as to the reason for excluding this case and others like it.

The current case before this court is not resolved by the statute. By "extinguishing" allottee's claims and providing the Claims Court as a forum for Indian Allottees to initiate litigation, Congress has expressly recognized a cause of action for claims arising out of the Settlement Act and its implementation. The language of the statute specifically addressed future litigation. Beginning in 1992, as a result of the statute, the Salt River Project will deliver additional water to the Salt River Indian Reservation for use on Indian allotments. The United States has contributed funds for the rehabilitation and expansion of irrigation facilities on the reservation that will enable the Indian community to manage and utilize fully its water entitlement. The transfer of responsibility to the Indian community furthers the established noble policy of reducing the role of the United States as guardian of the tribe's water interests. In sum, the statute provides that money is available immediately to improve the reservation irrigation delivery system, and that a total of 122,400 acre-feet of water per year (including ground water pumped on the reservation) will be available beginning in 1992. In return for these benefits, any claims by the tribes or individual allottees for failure to provide additional water rights are extinguished.[13] Congress has consented and allowed Allottees to pursue valid pre-existing claims and claims arising from the Settlement Act by maintaining actions against the United States in this court pursuant to 28 U.S.C. § 1491 (1982). Section 10, subparagraph 6(A), limits damages to those incurred no more than six years prior to the commencement of an action. Congress gave no date when the right to bring an action would vest under the statute after implementation of the Settlement Agreement in 1991. Accordingly, if jurisdiction were based on the Act, the six-year statute of limitations prevents any recovery by an allottee for damage occurring prior to October 20, 1982. At trial counsel for plaintiff agreed that any recovery should be limited

---

12. As is evident from the plain language of the statute, the Settlement Act does not create new substantive rights or establish a governmental duty to act as fiduciary in managing water for the tribe or individual allottees, nor does the Act automatically extend this court's jurisdiction to every wrong regarding entitlement or delivery of water. Claims brought by the tribes must be examined under the same analytical framework applied to allottee claims in this case. Absent some other statute providing a jurisdictional basis, it is highly unlikely that this court would

find the Settlement Act established a substantive right in the tribe to recover.

13. Even if this court assumed jurisdiction based on the Settlement Act and found the government liable, recovery by the tribes would be limited to the period after June, 1982. The tribes have previously settled all claims for failure to deliver water from 1879 to June 16, 1982. Accordingly, any claim by the tribes for failure to acquire or deliver water during the period prior to the 1982 settlement date would constitute a fraudulent claim.

to six years based on the statute of limitations.[14] In effect the Act acknowledges that there may have been valid damage claims by allottees that preceded the Act, and that the claims may continue to occur until 1992 when additional water deliveries to the reservation will commence. After water becomes available, § 10(a)(3) provides that the additional water will constitute complete satisfaction of all claims and no new claims will arise after 1992. Indeed, by providing water to the reservation and funding a community trust fund for the construction of additional irrigation delivery systems, the United States has effectively transferred the responsibility for water delivery to the Indian community beginning in 1992.

## II. Allottees And The *Winters* Right

▮ A second and fundamental reason this court lacks jurisdiction is the nature of the *Winters* right itself. Allotted tribal lands and the corresponding *Winters* right to water are communal in nature. Title resides in the tribe itself and is not held by individual Indians. *United States v. Chase*, 245 U.S. 89, 99–100, 38 S.Ct. 24, 27, 62 L.Ed. 168 (1917). Recently the Court reaffirmed this principle and held: "Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members." *United States v. Jim*, 409 U.S. 80, 82, 93 S.Ct. 261, 263, 34 L.Ed.2d 282 (1972) (quoting *Cherokee Nation v. Hitchcock*, 187 U.S. 294, 307, 23 S.Ct. 115, 120, 47 L.Ed. 183 (1902)). Nothing in the General Allotment Act or other statutes governing irrigation of allotments suggests that Congress was partitioning and conveying tribal water rights as it did with tribal lands. Neither the Supreme Court nor the Federal Circuit have presumed a Congressional intent to convey to Indian allottees an appurtenant right to an individual share of their tribe's reserved waters. The Supreme Court has only confirmed that an Indian allottee has the "right to use some portion of tribal waters essential to cultivation...." *United States v. Powers*, 305 U.S. 527, 532, 59 S.Ct. 344, 346, 83 L.Ed. 330 (1939).

▮ The General Allotment Act gave the Secretary power to promulgate regulations to secure a just and equal distribution of irrigation water among Indians on a reservation. The Act provides:

> In cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior is authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservations; and no other appropriation or grant of water by any riparian proprietor shall be authorized or permitted to the damage of any other riparian proprietor.

25 U.S.C. § 381 (1988). Thus, the Secretary's regulatory authority is limited in that he may not authorize or permit one Indian allottee to take water to the detriment of another except to equalize their use of irrigation water. The statute implies that individual Indians with allotments should have access to a share of available tribal irrigation water. The Act does not create a vested right in Indian allottees to receive water beyond their individual share of tribal water. Congress clearly intended that farm allotments be irrigated. Section 381 provides a means for the Secretary to allocate available irrigation water equitably among allotted reservation lands. The statutes do not provide, however, for an individual hold on a

---

**14.** At trial the following exchange took place:

> THE COURT: You are asking me to say that the United States owes money—
>
>     \*    \*    \*    \*    \*    \*
>
> MR. SHEA: Yes. That is right. The water will not come until 1891, [sic] and [as] of that date, there will be no more damages claims by anyone connected with the Salt River Indian reservation.
>
> THE COURT: Right now, you want me to—
>
> MR. SHEA: But, until then, we are asking the Court to restore the Plaintiffs to the economic position that they would be in during the period of the statutes of limitations, if they were not Indians....

Transcript of proceedings, filed May 11, 1989 at 83.

**300**

vested property right in a pro rata share of the tribes' reserved right.

 *Winters* rights can exist only in a coherent system if they are held by the government. Conveyance of a *Winters* right with its exemption from state water law doctrines would give individual allottees the power to demand water previously put to beneficial use by prior appropriators. The *Winters* right doctrine must, therefore, be held by the government with title residing in the tribes themselves. Accordingly, when additional water for agriculture is needed over the amount provided by the government the tribes may exercise their sovereign powers and seek additional water. The rights of individual allottees are limited to making a demand for a portion of that tribal water; a matter over which this court has no jurisdiction.

The extent and priority of tribal water rights have been determined by courts other than this one. The Supreme Court in passing judgment upon the McCarran Amendment, that waived sovereign immunity in state water rights adjudications, found that it gave rise to a "unique type of proceeding" whereby Indian water rights are adjudicated in state courts. *Arizona v. San Carlos Apache Tribe,* 463 U.S. 545, 569, 103 S.Ct. 3201, 3214, 77 L.Ed.2d 837 (1983). At the time of trial, the only valid determination of water rights on the Salt River was the Kent Decree of 1910.[15] Accordingly, this court cannot determine the amount of water that should be available to the Indians for use by allottees.

## CONCLUSION

After considering the evidence presented at trial, the statutes and regulations cited by the parties, as well as relevant case law, this court concludes that the standard expressed by the Supreme Court in *Mitchell II* has not been satisfied. The sections of the General Allotment Act are insufficient to create any form of fiduciary relationship. Further, neither the irrigation statutes and regulations, nor the reclamation

statutes gave rise to a comprehensive scheme whereby the government would be subjected to the high standards required of a trustee. Finally, the Settlement Act of 1988, though providing jurisdiction for some claims by individual Indian allottees, does not give this court jurisdiction over the matter. Moreover, this court is powerless to provide relief to plaintiffs because of the nature of the *Winters* right. The *Winters* right is held by the tribe for the benefit of all Indians in the community. Accordingly, the tribe, not individual Indian allottees, is the proper party to seek enforcement or extension of the *Winters* right. Individual Indians may seek compensation from the tribe if they have been denied a equal share of the tribe's water.

Plaintiffs failed to establish that their claims lie within the jurisdiction of this court as set forth in *Mitchell II.* Plaintiffs also failed to show that the *Winters* right extended to individual allottees. Accordingly, the Clerk is directed to dismiss plaintiffs' complaint and enter judgment for defendant.

---

**15.** During the period since trial, there has been a settlement of pending state proceedings gov-

erning the extent of respective water rights.