**SALT RIVER PIMA–MARICOPA INDIAN COMMUNITY,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 229–89L.

United States Claims Court.

May 11, 1992.

Philip J. Shea, Phoenix, Ariz., for plaintiff.

R. Anthony Rogers, with whom was Acting Asst. Atty. Gen. Barry M. Hartman, Washington, D.C., for defendant. William Swan, Office of Field Sol., Phoenix, Ariz., of counsel.

## OPINION

BRUGGINK, Judge.

On January 23, 1992, the court ordered plaintiff to show cause as to why this case should not be dismissed on the basis of the decision in *Grey v. United States*, 21 Cl.Ct. 285 (1990), *aff'd*, 935 F.2d 281 (Fed.Cir. 1991), *and cert. denied*, —— U.S. ——, 112 S.Ct. 934, 117 L.Ed.2d 105 (1992). The *Grey* plaintiffs were individual members of the Salt River Pima–Maricopa Indian Community (the "Tribe"). The plaintiff in this case is the Tribe itself. This case arises out of the same facts as *Grey*. After reviewing the papers submitted by the parties, we find that the reasoning from *Grey* is applicable here. Thus, the complaint in the instant case is dismissed for failure to state a claim.

## BACKGROUND

In February 1988, the Tribe entered into the Salt River Pima–Maricopa Indian Community Water Rights Settlement Agree-

ment (the "Settlement Agreement") with a number of other parties. That agreement was an attempt to settle a lawsuit filed by the Tribe alleging, inter alia, mismanagement by the Department of the Interior of the Tribe's water resources. One of the terms of the agreement was the appropriation of $10 million to the Tribe. It was understood that the agreement would require legislation to be effective. *See* S.Rep. No. 495, 100th Cong., 2d Sess. 4–5 (1988).

In October 1988, Congress enacted the Salt River Pima–Maricopa Indian Community Water Rights Settlement Act, Pub.L. No. 100–512, 102 Stat. 2549 (1988) (the "Settlement Act" or "the Act"), to confirm the agreement. The Act extinguished the existing claims of the allottees and granted them consent to sue the United States in the Claims Court on those extinguished claims. Settlement Act §§ 10(a)(1), 10(a)(4). The Act did not mention any existing claims by the Tribe,[1] but provided that if the Tribe were to file suit in the Claims Court within two years of the Act's enactment, the United States could only assert an eight year statute of limitations rather than the six year statute provided for in 28 U.S.C. § 2501. Settlement Act § 10(b)(2). Plaintiff's sole assertion here is that the Settlement Act itself created substantive rights to relief.

## DISCUSSION

In *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("*Mitchell I*"), and *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*"), the Supreme Court established the analysis to be applied to determine whether a complaint states a claim for breach of statutory duty. In *Mitchell II*, the Court found that the collective effect of the various timber statutes and regulations at issue there was to cre-

ate a special trust relationship between the United States and certain Indian tribes as to the management of the Indians' timber resources. *Mitchell II*, 463 U.S. at 222, 103 S.Ct. at 2970. Breach of that trust by the Government would trigger the right to compensation.

■ The *Grey* plaintiffs argued that legislation dealing with irrigation of Indian lands gave rise to such a special trust relationship obligating the Government to deliver adequate amounts of water to the allottees. After a careful examination of the legislative and regulatory regime with regard to the supply of water to the Indians, we held in *Grey* that those enactments and regulations did not establish a fiduciary obligation by the Government to the allottees. *See Grey*, 21 Cl.Ct. at 293–96. Thus, the complaint did not allege a breach of a statutory duty. We also held that although the Settlement Act provided a forum for the resolution of the allottees' claims, it did not create any substantive right enforceable against the United States for money damages. In this way, the Settlement Act is similar to the Tucker Act;[2] it operates as a waiver of sovereign immunity, but only if the plaintiff can show a breach of a statutory duty. In an unpublished opinion, the Federal Circuit affirmed *Grey* and essentially adopted the reasoning therein. The Supreme Court denied certiorari.

The complaint in this case is nearly identical to the *Grey* complaint. Both allege the existence of a duty of the Government to deliver water to Indian lands. In its response to the court's show-cause order, the Tribe cites no statute or case law to support its contention that the Tribe's case should be analyzed differently than the allottees' cases.[3] Nor does it attempt to distinguish the cases factually. Instead, the Tribe relies exclusively on the legislative history of the Settlement Act as sup-

**1.** Defendant notes that the Tribe had settled its claims in 1982.

**2.** 28 U.S.C. § 1491 (1988).

**3.** As this court noted in *Grey:* "Claims brought by the tribes must be examined under the same

analytical framework applied to allottee claims in this case. Absent some other statute providing a jurisdictional basis, it is highly unlikely that this court would find the Settlement Act established a substantive right in the tribe to recover." *Grey,* 21 Cl.Ct. at 298 n. 12.

port for an argument that the Act creates a right to money damages in the Tribe.

■ It is true that original language of the bill that later became the Settlement Act provided that the Government would pay the Tribe $10 million "in full and complete satisfaction of all claims of the [Tribe] against the United States...." S. 2153, 100th Cong., 2d Sess. § 10(b)(2) (1988). It was not passed in that form, however. The Department of Justice opposed that provision because it did not consider the Tribe's claims meritorious. Representatives of the administration indicated that the President would veto the legislation if the $10 million appropriation was not deleted. *Settlement of the Water Claims of the Salt River Pima–Maricopa Indian Community in Maricopa County, Arizona: Joint Hearing on S. 2153 and H.R. 4102 Before the Select Committee on Indian Affairs (Senate) and the Committee on Interior and Insular Affairs (House)*, 100th Cong., 2d Sess. 60–61 (1988) [hereinafter *Joint Hearing* ] (statement of James W. Ziglar, Assistant Secretary for Water and Science, Department of the Interior).

The Tribe, however, points to the negotiations that lead to the deletion. During the Joint Hearing, Senator DeConcini advised the Tribe's representative of the administration's concerns. The Senator then asked the Tribe if it would be willing to drop its request for $10 million in exchange for the right to pursue its claims in the Claims Court. Counsel for the Tribe replied that the Tribe was "completely prepared to work out an accommodation on this issue." *Joint Hearing, supra,* at 73. The Tribe contends that it accepted the Senator's offer and thus "struck a bargain" that it would be able to litigate its claims here. In the version of the Act signed by the President, the provision extending the statute of limitations from six to eight years was inserted in place of the provision appropriating $10 million.

There are three difficulties with plaintiff's analysis. The first has to do with the enforceability of an alleged agreement. Legislation is inherently the product of compromise. But courts are compelled to look only to those compromises that appear in writing, are adopted by both houses, and signed by the President. The Treasury cannot be vulnerable to promises that appear exclusively during negotiations to grease the passage of legislation, even if they are reflected in the legislative history.

The second problem with the plaintiff's argument is that there was no promise, implied or explicit, to pay the Tribe. Congressman Udall captured the essence of the compromise that was struck. In addressing counsel for the Tribe, he said:

Make no mistake about what Senator DeConcini talked about here. This $10 million is viewed with grave concern by the administration. It is the stuff veto messages are made of, and if we can handle it so your rights can be litigated in the Court of Claims, we would be in my judgment smart to go down that road.

*Joint Hearing, supra,* at 73 (statement of Congressman Udall). The administration was prepared to veto the bill on the basis of the $10 million appropriation because it did not feel that the Tribe's claims had any merit. *Id.* at 60–61. Rather than just extinguishing the Tribe's claims, Congress compromised and provided the Tribe with a forum to test those claims. The legislation did no more than put off the Tribe's claim. It certainly did not recognize rights where none existed, with the possible exception of the implied waiver of a defense of res judicata. Neither Senator DeConcini nor Congressman Udall offered an opinion as to whether the Tribe's claims arose out of a breach of a statutory duty. They simply proposed that the claims be kept alive for later determination by the Claims Court.

Finally, the Senator's "promises" were fulfilled. The Tribe was allowed to bring this suit, even though these claims were arguably settled in 1982. The Settlement Act clearly [4] and solely provided a forum in

---

4. As the Seventh Circuit held in *Trustees of Iron Workers Local 473, Pension Trust v. Allied Products Corp.,* 872 F.2d 208, 213 (7th Cir.1989):

[T]he clear language should be the guide to congressional intent. Discarding the plain language of a statute in favor of committee

which the Tribe could present its claims. It did not create or acknowledge a substantive right to relief, as required by *Mitchell II.* Whatever substantive rights the Tribe had, therefore, pre-existed the Settlement Act. But as we held in *Grey*, there is no substantive basis for the Tribe's claims. The water management statutes and regulations at issue in this case do not grant the Government the same extensive custody over the Indian lands that the timber statutes granted to the Government in the *Mitchell* cases. Due to the much higher level of control the Indians in this case exercise over their lands, no fiduciary obligation or trust relationship attaches with respect to the delivery of water to those lands.

The language of the Settlement Act provides that the Tribe may file suit against the United States in the Claims Court. It has done so and failed *on the merits.* The Act does not create a new substantive right to money damages.

Plaintiff argues that a dismissal on jurisdictional grounds—i.e., "the court cannot hear such claims"—would be inconsistent with the assumptions behind the Act. The court agrees. The term "jurisdiction" is often applied too loosely when dealing with money claims against the Government. It is arguably incorrectly applied in cases where there is merely no showing of a substantive right to relief. From the standpoint of subject matter jurisdiction, sovereign immunity has been waived when Congress creates a forum to hear certain types of claims, as it did in the Tucker Act.

What is lacking in the perfection of the waiver of sovereign immunity is not jurisdiction in this court, but substance in the plaintiff's claim. In this case, the court has subject matter jurisdiction under the Tucker Act to hear non-frivolous claims based on a statute. The Tribe asserts such a claim. It has simply failed to show that it is *substantively* entitled to relief.[5]

Because the Tribe's claim does not derive from a substantive right to money damages, it must be dismissed pursuant to RUSCC 12(b)(4) for failure to state claim upon which relief can be granted. The Clerk is directed to dismiss the complaint. No costs.

reports or other legislative history ignores the realities of the legislative process. The crafting of specific language often reflects legislative compromise reached after hard fought battles over the means to reach even common goals. Courts should only reluctantly turn to legislative history for fear of upsetting the delicate balance reflected in a finally worded piece of legislation. In this case "the plain language" of the statute "is the best evidence of its meaning."
(citations omitted).

**5.** In *Mitkof Lumber Co. v. United States,* 23 Cl.Ct. 383 (1991), we noted that the *Mitchell* cases and the cases cited therein "suggest a two-step analysis. If the claim that the statute can be fairly construed to mandate the payment of

money is not frivolous, jurisdiction attaches. If there is jurisdiction, the inquiry then becomes whether the circumstances and the entity involved are within the coverage of the statute." *Mitkof,* 23 Cl.Ct. at 389. In this case, the Tribe's claim that the water management legislation creates a duty is not frivolous. *See Ralston Steel Corp. v. United States,* 340 F.2d 663, 667, 169 Ct.Cl. 119, 125, *cert. denied,* 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965) ("If the plaintiff asserts that his claim 'arises under' or is 'founded' on federal legislation or regulation 'to determine whether that claim is well founded,' the court 'must take jurisdiction, whether its ultimate resolution is to be in the affirmative or the negative.'" [citations omitted] ).